1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

9  RAYMOND PAUL ROSAS,

10          *Petitioner*,                          3:06-cv-00387-LRH-VPC

11  vs.                                            ORDER

12

13  BILL DONAT, *et al.*,

14          *Respondents*.

15

16      This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the

17  remaining claims.

18                              *Background*

19      Petitioner Raymond Paul Rosas challenges his 2000 Nevada state conviction, pursuant to a jury

20  verdict, of first-degree murder with the use of a deadly weapon, first-degree kidnapping with the use

21  of a deadly weapon, and conspiracy to commit murder.  Petitioner challenged his conviction both on

22  direct appeal and state post-conviction review.  The factual particulars regarding the claims, including

23  the trial evidence pertaining to petitioner's challenge to the sufficiency of the evidence, are discussed

24  *infra* in the discussion of the particular claims.

25                      *Standard of Review on the Merits*

26      The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"

27  standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court

28  decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under

1   this highly deferential standard of review, a federal court may not grant habeas relief merely because

2   it might conclude that the state court decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28

3   U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to

4   or involved an unreasonable application of clearly established law as determined by the United States

5   Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable

6   determination of the facts in light of the evidence presented at the state court proceeding.  131 S.Ct. at

7   1398-1401.

8        A state court decision is "contrary to" law clearly established by the Supreme Court only if it

9   applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision

10   confronts a set of facts that are materially indistinguishable from a Supreme Court decision and

11   nevertheless arrives at a different result.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10,

12   157 L.Ed.2d 263 (2003).  A state court decision is not contrary to established federal law merely

13   because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a

14   state court need not even be aware of its precedents, so long as neither the reasoning nor the result of

15   its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply

16   holding a view different from its own, when the precedent from [the Supreme] Court is, at best,

17   ambiguous."  540 U.S. at 16, 124 S.Ct. at 11.  For, at bottom, a decision that does not conflict with the

18   reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

19        A state court decision constitutes an "unreasonable application" of clearly established federal

20   law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts

21   of the case was not only incorrect but "objectively unreasonable."  *E.g., Mitchell*, 540 U.S. at 18, 124

22   S.Ct. at 12; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

23        To the extent that the state court's factual findings are challenged, the "unreasonable

24   determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert*

25   *v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be

26   particularly deferential" to state court factual determinations.  *Id*.  The governing standard is not

27   satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

28   Rather,  AEDPA requires substantially more deference:

1

2          . . . .  [I]n  concluding  that  a  state-court  finding  is  unsupported  by
           substantial evidence in the state-court record, it is not enough that we
3          would reverse in similar circumstances if this were an appeal from a
           district court decision.  Rather, we must be convinced that an appellate
4          panel, applying the normal standards of appellate review, could not
           reasonably conclude that the finding is supported by the record.

5   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

6          Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

7   rebutted by clear and convincing evidence.

8          The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled

9   to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

10                                              ***Discussion***

11          ***Sufficiency of the Evidence of First-Degree Murder – Ground 6***

12          The Court addresses petitioner's challenge to the sufficiency of the evidence at the outset for

13  two reasons.  First, a conclusion that the evidence was insufficient to sustain the conviction would moot

14  other grounds in whole or in part, because such a conclusion would require that the first-degree murder

15  conviction be vacated without opportunity for a retrial as to first-degree murder.  Second, consideration

16  of the prejudice issue on petitioner's claims of ineffective assistance of counsel involves a consideration

17  of the overall evidence at trial.

18          In Ground 6, petitioner alleges that he was denied due process in violation of the Fifth and

19  Fourteenth Amendments because the evidence at trial allegedly was insufficient to prove beyond a

20  reasonable doubt that petitioner committed the premeditated, willful and deliberate murder of the victim

21  as required for a conviction of first-degree murder as opposed to second-degree murder or voluntary

22  manslaughter.

23          On direct appeal, the Supreme Court of Nevada summarized the trial evidence and rejected the

24  claim presented to that court as per the following:

25                Appellant's sole contention is that the State adduced insufficient
           evidence to support the jury's verdict on the first-degree murder charge.
26         In particular, appellant argues that he accidentally shot the victim, and
           therefore the facts are more consistent with voluntary manslaughter or
27         second-degree murder than first-degree murder.  We disagree.

28                When reviewing a claim of insufficient evidence, the relevant

                                                    -3-

inquiry is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Furthermore, "it is the jury's function, not that of the court to assess the weight of the evidence and determine the credibility of witnesses."

Our review of the record on appeal reveals sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. Appellant rented a room in the home of the victim, Homer Mitchell Stockmann during August and September of 1999. Over the Labor Day weekend, appellant had a party at the house. During that party, appellant and two other individuals, Edward McQueen and Cecele Linton, discussed a plan to kill Stockmann. McQueen testified that the discussion was just a joke; appellant and Linton did not give similar testimony. The plan involved appellant sitting behind Stockmann in his vehicle and stabbing Stockmann in the neck. Although the plan originally involved McQueen, he became intoxicated and fell asleep before the plan could be carried out.

Appellant used a ruse to get Stockmann to leave the house. The prior week, Stockmann's truck had been stolen. Unknown to Stockmann, appellant and some friends had stolen the truck, driven it to Frenchman's Lake, vandalized it, and attempted to set it on fire. After arranging for another friend, Brad Kimes, to provide Stockmann with information regarding the location of the truck, appellant and Linton agreed to accompany Stockmann on the evening of September 4, 1999, as he drove toward Frenchman's Lake in search of his truck. Appellant sat behind Stockmann, who was driving. Although appellant had a knife with him, he did not stab Stockmann during the drive. Appellant testified that he got too scared to stab Stockmann.

Stockmann eventually stopped the car to get out and look for his truck. Appellant accompanied him, while Linton waited in the car. According to appellant, Stockmann took a shotgun out of the trunk of the car because he was afraid that the person who stole the truck might be in the area. Appellant and Stockmann walked away from the vehicle into the dark. Appellant asked Stockmann if the shotgun worked. Stockmann said that it did and fired a shot into the air. When appellant asked to look at the shotgun, Stockmann put the safety on and handed the gun to appellant. Appellant, who had prior military training, turned the safety off and, while walking behind Stockmann, shot him in the back. Appellant returned to the car and informed Linton that "he was done." Linton, however, observed Stockmann's head moving and told appellant to shoot Stockmann in the head. Appellant did so. Appellant and Linton then dragged Stockmann's body away from the dirt road.[FN3]

> [FN3] Linton pleaded guilty to first-degree murder and testified against appellant. In exchange for her guilty plea, the State dismissed the weapon enhancement and kidnapping and conspiracy charges and agreed to recommend a sentence of life in prison. McQueen also testified against appellant; however, he was never charged in connection with Stockmann's murder and received no deals for his testimony.

-4-

1

2           Appellant eventually returned to Stockmann's home later that
    evening and bragged to McQueen that he had shot Stockmann in the
3   back and the head.  Appellant also contacted Kimes and told him that
    Stockmann had been taken care of.  Appellant later contacted Kimes a
    second time and eventually gave the shotgun to Kimes, telling Kimes
4   that he had shot Stockmann in the back and the head.

5           Stockmann's body was discovered on September 6, 1999. He had
    died of gunshot wounds to the back and head.
6

7           When interviewed by police, appellant gave several different
    stories.  Appellant first claimed that he had no involvement in
8   Stockmann's death, then claimed that he was present when an
    unidentified black man shot Stockmann.  Later, appellant claimed that
    Stockmann asked him to accompany him into the mountains and shoot
9   him.  Appellant eventually admitted that he shot Stockmann in the back
    and head after luring him into the mountains to search for his truck;
10  however, appellant claimed that the first shot was an accident.  At the
    time of his arrest, appellant was living in Stockmann's home and wearing
11  Stockmann's clothes.

12          Appellant ' s testimony at trial was similar to the final version of
    events that he recounted during the police interview.  Appellant testified
13  that he accidentally shot Stockmann in the back.  Appellant explained
    that he was pointing the gun forward and looking down at it when
14  Stockmann, who had been standing next to him, walked in front of him.
    Appellant further testified that Linton instructed him to shoot Stockmann
15  in the head, but he did not know why he did so.  Appellant also testified
    that he had grown to dislike Stockmann because of the way he
16  disrespected appellant and treated Stockmann's girlfriend, which
    reminded appellant of his father, who had physically abused appellant
17  and his mother.[FN4]

18              [FN4] Appellant was nineteen years old at the time of the
                killing.  He testified that he had been physically abused
19              by his father from a very young age.  Appellant did not
                testify that Stockmann ever physically abused him.
20

21          The jury could reasonably infer from the evidence presented that
    appellant killed Stockmann with malice aforethought and that the killing
22  was willful, deliberate and premeditated or was committed in the
    perpetration of a kidnapping.  It is for the jury to determine the weight
    and credibility to give conflicting testimony, and the jury's verdict will
23  not be disturbed on appeal where, as here, substantial evidence supports
    the verdict.
24

25          [We have] considered appellant's contention and concluded that
    it is without merit . . . .

26  #26, Ex. 44, at 1-5 (citation footnotes omitted).

27      Petitioner has not shown by clear and convincing evidence to the contrary that the state supreme

28  court's summary of the trial evidence in its decision on direct appeal is incorrect.  The state high court's

1  summary of the evidence thus is presumed to be correct.  *See,e.g., Sims v. Brown*, 425 F.3d 560, 563

2  n.1 (9th Cir. 2005).

3        On the foregoing trial evidence, the state supreme court's rejection of petitioner's claim of

4  insufficient evidence was neither contrary to nor an unreasonable application of *Jackson v. Virginia* and

5  following authority.

6        On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable

7  hurdle."  *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the standard announced in

8  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand

9  if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

10  could have found the essential elements of the offense beyond a reasonable doubt.  *E.g., Davis*, 333 F.3d

11  at 992.  Accordingly, the reviewing court, when faced with a record of historical facts that supports

12  conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the

13  prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific

14  conflicts does not affirmatively appear in the record.  *Id.*  The *Jackson* standard is applied with reference

15  to the substantive elements of the criminal offense as defined by state law.  *E.g., Davis*, 333 F.3d at 992.

16  When the deferential standards of the AEDPA and *Jackson* are applied together, the question for

17  decision on federal habeas review thus becomes one of whether the state supreme court's decision

18  unreasonably applied the *Jackson* standard to the evidence at trial.  *See,e.g., Juan H. v. Allen*, 408 F.3d

19  1262, 1274-75 (9th Cir. 2005).

20        Petitioner contends:

21

22        In the instant case, the evidence presented at trial was insufficient [sic?] to support the conclusion that Rosas abandoned his intent to kill Stockman.  As outlined in the petition, the facts presented at trial

23  demonstrated that Eddie McQueen and Cecele Linton originally came up with the idea to stab Mr. Stockman. (Ex. 27, pp. 71, 75, 77, 96; Ex. 28,

24  pp. 70-72.)  McQueen was too intoxicated to leave with Rosas, Linton and Stockman, so he stayed at the party. (Ex. 27, pp. 84, 107.)  On the

25  way out of town, Rosas lost his nerve to follow through with the plan. (Ex. 28, p. 73.)  Rosas told Stockman not to stop on the side of the road.

26  (Id. at 73-74.) Stockman insisted on stopping. (Id.) It was at that point that Stockman informed Rosas and Linton that he had a shotgun in the

27  car. (Id. at 75.)

28        Stockman showed Rosas that the shotgun, indeed, was in

-6-

working condition. (Id. at 76.) Rosas was afraid for Stockman to handle the gun and asked to see it. (Id. at 77.) As Stockman was walking, Rosas accidentally shot the weapon. (Id. at 78.) He did not mean for the shooting to occur. (Id.) When Rosas returned to the car, it was Linton who insisted that Rosas return and "shoot him in the head." (Id. at 79.) #48, at 25.[1]

Petitioner thus in essence proceeds on the premise that if a defendant simply testifies that he abandoned his intent to kill the victim, that he then nonetheless accidentally shot the victim the first time after he intentionally disengaged the weapon's safety, and that he then shot the possibly still-moving victim a second time in the back of the head simply because someone else "insisted" that he do so, the jury must accept this testimony at face value and cannot convict him of first-degree murder.

Such clearly is not the law.

The jury readily could infer from evidence presented at trial that Rosas intentionally lured Stockmann to a remote area pursuant to a premeditated plan to kill Stockmann, that Rosas – at least as of the time that he instead shot Stockmann – had not yet followed through on the initial plan of stabbing him to death by hand with a knife, that Rosas then seized upon the opportunity presented of simply shooting Stockmann in the back, that the firearm-experienced Rosas disengaged the safety on the weapon for this very purpose and then shot Stockmann, that Rosas then – whether at another's "insistence" or not – shot the victim a second time in the head to make sure that he died, that Rosas thereafter bragged about his intentional killing of Stockmann, and that Rosas thereafter tried to conceal his "accidental" shooting of Stockmann through a series of lies culminating in the "accidental shooting" account. Clearly, against the backdrop of the evidence presented, the jury was not required to accept Rosas' self-serving account; and the jury could infer from the remaining evidence, from both prior to and after the first shot, that the killing was intentional and premeditated rather than accidental.

*Jackson v. Virginia* clearly does not give a criminal defendant the ability to secure an acquittal premised upon constitutionally insufficient evidence against such a factual backdrop merely by claiming – ultimately, after being focused upon as a suspect – that the first shot was accidental. The Due Process Clause does not preclude a jury from making what in this case was a ready inference to the contrary.

---

[1] There was no trial testimony that Rosas allegedly lost his nerve specifically "on the way out of town."

-7-

1     Moreover, even if petitioner could establish, on the only exhausted and non-defaulted claim

2     before the Court in this regard, that his self-serving claim that the first shot was accidental rendered the

3     evidence insufficient to demonstrate that the killing was willful, premeditated, and deliberate, which

4     he cannot do, he still would not be able to establish thereby that the evidence was insufficient to sustain

5     his conviction for first-degree murder.  As noted by the Supreme Court of Nevada in its decision, the

6     jury had sufficient evidence from which to infer "that appellant killed Stockmann with malice

7     aforethought and that the killing was willful, deliberate and premeditated *or was committed in the*

8     *perpetration of a kidnapping*."  A general verdict need not be set aside "merely on the chance ... that

9     the jury convicted on a ground that was not supported by adequate evidence when there existed

10    alternative grounds for which the evidence was sufficient." *Griffin v. United States*, 502 U.S. 46, 59-60,

11    112 S.Ct. 466, 116 L.Ed.2d 371 (1991)(*citing United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir.

12    1991)).  Petitioner's exhausted challenge as to whether the evidence was sufficient to establish that the

13    killing was willful, deliberate, and premeditated does not undercut the alternative felony-murder basis

14    for a first-degree murder verdict.  In this regard, it is well-established law that even an accidental killing

15    in the course of an enumerated felony suffices for a first-degree murder conviction based upon the

16    killing occurring during the predicate felony.  *See,e.g., Crawford v. State*, 121 Nev. 744, 749, 121 P.3d

17    582, 585 (2005); *Payne v. State,* 81 Nev. 503, 506, 406 P.2d 922, 924 (1965).  *Indeed, under the felony*

18    *murder rule, Rosas needed to have only the specific intent required for kidnapping*.[2]

19    In all events, however, the evidence at trial clearly was sufficient to support a jury determination

20    that the killing was willful, deliberate and premeditated.

21    The state supreme court's rejection of this claim accordingly was neither contrary to nor an

22    unreasonable application of clearly established federal law.

23    Ground 6 therefore does not provide a basis for federal habeas relief.[3]

24

25    [2]#25, Ex. 29, Instr. No. 33 (at Bates page number 00748).  See also *id.*, Instr. No. 25 (elements of kidnapping).

26

27    [3]In the reply, petitioner refers to the Supreme Court of Nevada jurisprudence regarding first-degree murder jury
      charges in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), and *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).
28    The Court only can assume that this passing reference is not intended to present a  claim as to alleged jury charge error.

(continued...)

***Effective Assistance of Trial Counsel – Ground 3***

In Ground 3, petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to take certain actions specified in eight subparts to the claim.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time.  The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

With this standard in mind, the Court turns to the specific claims.

***Mental Health Defense – Ground 3(A), part***

In Ground 3(A), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to call a competent mental health expert during the guilt and penalty phases of the trial, failed to present a mental health defense to the specific intent elements of the offenses, and failed to proffer a theory of defense instruction concerning same.

---

[3](...continued)

Such a claim of course could not be raised for the first time in the reply rather than through a motion for leave to amend the pleadings in which petitioner demonstrated that such amendment would not be futile given, *e.g.*, exhaustion and timeliness concerns.  There has been no such *Kazalyn* instruction error claim raised in this case.  The Court further would note that the relevant jury instruction in this case differed significantly from the charge disapproved of in *Byford*, and the instruction in *this* case instead specifically distinguished between willfulness, deliberation and premeditation. *Compare Byford*, 116 Nev. at 232, 994 P.2d at 712 *with* #25, Ex. 29, Instruction No. 34, at Bates-stamp numbers 00749-00750.  Petitioner's reference to *Kazalyn* and alleged conflation of the elements for first-degree murder thus would appear to concern an issue that not only is beyond the pleadings but also is completely irrelevant to this case.

The state district court denied this claim following an evidentiary hearing at which petitioner presented expert testimony from Dr. Martha Mahaffey, Ph.D, a psychologist.

### *Guilt Determination*

On the state post-conviction appeal, the Supreme Court of Nevada rejected the claims presented to that court with respect to the guilt phase on the following grounds:

    1.    <u>Failure to call psychologist Dr. Martha Mahaffey as a witness</u>

        Rosas first contends that the district court improperly denied his claim that his trial counsel, Washoe County Deputy Public Defender Maizie Pusich, was ineffective for failing to call Dr. Martha Mahaffey, a psychologist, to testify as an expert witness. During his trial, Rosas defended himself on the theory that he was under the control of an accomplice, Cecele Linton, when he committed his crimes. Of the two fatal shotgun blasts Rosas fired at the victim, Homer Mitchell Stockmann, he maintained at trial that the first was an accident and the second was done only after Linton ordered him to shoot.

        Dr. Mahaffey testified during the evidentiary hearing that Rosas had several mental health disorders and substance abuse problems that were related to physical abuse he suffered from his father and sexual abuse he suffered from his stepsister when he was a child. Dr. Mahaffey believed that these disorders and problems triggered a post-traumatic stress reaction in Rosas before, during, and after he kidnapped and killed Stockmann. Had Pusich called Dr. Mahaffey to testify, Rosas maintains, it would have shown that he lacked the requisite <u>mens rea</u> to commit these crimes.

        The district court found that Rosas did not show how any failure by Pusich to secure Dr. Mahaffey's testimony was unreasonable or how he was prejudiced by its omission from his trial. We agree.

        Our review of Dr. Mahaffey's testimony reveals that she may have bolstered Rosas's theory of defense, but not so much so that there is a reasonable probability that it would have altered the jury's verdict. Contrary to Rosas's assertion, the whole of Dr. Mahaffey's testimony did not support the proposition that he lacked the <u>mens rea</u> to kidnap and murder in the first-degree. Despite her belief that Rosas suffered from post-traumatic stress, Dr. Mahaffey also opined that at the time of the crimes Rosas knew right from wrong, he had the capacity to make voluntary choices, and he had the capacity to deliberate. She expressly declined to conclude that he lacked the capacity to premeditate. Dr. Mahaffey also could not conclude that Rosas lacked the capacity to form the specific intent to kill.

        Rosas has failed to demonstrate that he was prejudiced by Dr. Mahaffey's absence from his trial or that any failure by Pusich to call her as a witness was unreasonable. For these reasons, we conclude that the district court properly denied him relief on this claim.[FN10]

[FN10] Rosas also contends on appeal that Pusich was ineffective for failing to have the jury instructed about whether he had the requisite intent to commit first-degree murder and kidnapping. The district court did not specifically address this argument in its order, but the State briefly responds to its merits on appeal. Our review of the record reveals that it was raised by Rosas in a supplemental petition in only a general manner. To the extent this argument was properly raised below, we conclude that it is belied by the record and without merit because the jury received instructions properly defining the elements of both crimes.

Moreover, Rosas's reliance upon this court's decision in Geary v. State and other authority in contending that Pusich was ineffective for failing to offer additional instructions regarding his "state of mind" is misplaced. See 91 Nev. 784, 792-93, 544 P.2d 417, 422-23 (1975). Geary and the other cases Rosas cites neither addressed the effectiveness of counsel nor mandated that a "state of mind" instruction be given.

#30, Ex. 79, at 3-4.

The state supreme court's rejection of the claims presented with regard to the guilt determination was neither contrary to nor an unreasonable application of *Strickland* and following authority.

As noted by the Supreme Court of Nevada, the psychologist that petitioner presented in support of the claims on state post-conviction review: (a) opined that petitioner "could distinguish right from wrong," had the capacity to make voluntary choices, and "had capacity for deliberation;" (b) "did not conclude that he lacked capacity for premeditation;" and (c) could not rule out the conclusion that Rosas formed the specific intent to kill.[4]  On federal habeas review, petitioner offers a mélange of conditions and circumstances that he maintains should absolve him of accountability for shooting the victim, twice, with a 12 gauge shotgun after first planning to kill him through other means, by establishing that he could not form the specific intent required for the offenses.  These conditions and circumstances canvassed in petitioner's pleadings include ADHD, PTSD, depression, seizure disorder, abuse as a child including head trauma, sexual abuse, being teased about his childhood obesity, intoxication, the victim allegedly being rude to petitioner and his fiancée, and alleged coercion by Ms. Linton telling him to fire the second shot. See #22, at 19-23.  However, given the key findings – and absence of findings – by

[4]#29, Ex. 71, at 77-78, 100 & 102.

-11-

1  the psychologist summarized above, the state supreme court's conclusion that petitioner failed to carry

2  his burden of demonstrating that there was a reasonable probability that, but for trial counsel's failure

3  to pursue a "mental health defense," the outcome of the trial would have been different was not an

4  unreasonable application of *Strickland* .[5]

5      This same conclusion holds true as well with regard to petitioner's claim that trial counsel

6  should have requested a "state of mind" theory of defense instruction.  The state supreme court's

7  conclusion that such an instruction was not required under Nevada state law of course represents the

8  final word with regard to the application of Nevada state law.[6]  Further, in all events, consistent with

9  the foregoing discussion, the state supreme court's conclusion that there was not a reasonable

10  probability that  further pursuit of the defense would have affected the outcome at trial was not an

11  objectively unreasonable application of *Strickland*.

12      At trial, defense counsel, of necessity, often pursue defense theories that have only an extremely

13  low chance of success, given the evidence of guilt presented in the particular case.  On post-conviction

14  review, however, the prejudice prong of the *Strickland* analysis stands as a barrier to overturning an

15  otherwise presumptively valid state court conviction based upon possible defense theories with only,

16  at best, a meager chance of success.  The state high court's conclusion that petitioner's post-conviction

17  presentation of psychological testimony fell below the requisite threshold necessary to demonstrate

18  _____

19  [5]The Court notes here too that, for felony murder, the State needed to prove that Rosas had the specific intent

20  only to commit kidnapping, an offense that already was well underway when Rosas shot Stockmann.  See text, *supra*, at 8.

21  [6]Petitioner presents no apposite and controlling United States Supreme Court authority tending to establish that

22  the particular instruction in question would have been required by federal constitutional law at the time of the April 2000 trial.  The Ninth Circuit cases cited by petitioner with regard to a generalized due process right to a theory-of-defense

23  instruction expressly were decided under pre-AEDPA law, and the cited authorities trace back to Ninth Circuit federal criminal decisions.  *See Clark v. Brown*, 442 F.3d 708, 713 & 714-15 (9th Cir. 2006); *Conde v. Henry*, 198 F.3d 734,

24  738 & 739 (9th Cir. 1999).  Petitioner's – well-established – burden of course instead is to demonstrate that the state court decision was contrary to or an unreasonable application of clearly established federal law *as determined by the*

25  *United States Supreme Court* – and as of the time of the state court trial – vis-à-vis a request for such a charge.

26      The Court notes that, at the time of petitioner's trial, a Nevada state statute had purported to abolish the insanity

27  defense in Nevada.  The Supreme Court of Nevada subsequently held that the statute violated due process and reinstated the availability of the defense.  *See Finger v. State*, 117 Nev. 548, 27 P.3d 66 (2001).  Under Nevada law, the relatively

28  restrictive *M'Naghten* applies to the defense when it is available.  Moreover, as discussed in more depth *infra* as to Ground 3(D), the threshold required to establish an intoxication defense under Nevada state law is a high one.

1  prejudice was not an unreasonable application of the *Strickland* prejudice prong.  Ground 3(A) therefore

2  does not provide a basis for federal habeas relief with respect to the guilt determination.[7]

3               ***Penalty Phase***

4        The Court discusses all claims pertaining to the noncapital penalty phase of the proceedings

5  together at one time, *infra*.

6        ***Firearms Expert Testimony as to Trigger Pull – Ground 3(B)***

7        In Ground 3(B), petitioner alleges that he was denied effective assistance of counsel when trial

8  counsel failed to call a firearms expert to corroborate his defense that the first shot was accidental with

9  expert testimony regarding the trigger pull of the shotgun.[8]

10       The state district court denied this claim following an evidentiary hearing at which petitioner

11 presented expert testimony from Kevin Lattyak, who was accepted by the state district court as "a

12 forensic scientist and examiner."[9]

13       On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim presented

14 to that court with respect to the guilt phase on the following grounds:

15           2.    Failure to call ballistics expert Kevin Lattyak as a witness

16           Rosas next contends that the district court improperly denied his
17     claim that Pusich was ineffective for failing to call Washoe County
       Crime Lab Forensic Examiner Kevin Lattyak as a ballistics expert
18     witness. He contends that Lattyak's testimony would have corroborated
       his story that the first gunshot he fired at Stockmann was an accident.
19
20           The district court found that Pusich made a reasonable strategic
       decision not to call a ballistics expert to testify at trial and, even if
21     Lattyak had testified, it would have not changed the result.  We agree.

22           Our review of Lattyak's evidentiary hearing testimony reveals

---

23       [7]The fact that the Court considers only the prejudice prong does not constitute an implicit holding that
24 petitioner can satisfy the performance prong.  Petitioner must demonstrate both deficient performance and resulting
   prejudice.  The failure to demonstrate one, either one, eliminates a need to address the other.

25       [8]The expert has been referred to over the course of the state and federal proceedings as a "ballistics" expert, but
26 the expert did not provide any testimony regarding the ballistic properties and characteristics of the shot in flight after
   being fired from the shotgun, as opposed to testimony regarding the operation of the shotgun itself, in particular, the
27 trigger.  The Court is not sanguine that the expertise involved was expertise in "ballistics."

28       [9]#29, Ex. 70, at 91.

-13-

that it would not have supported Rosas's defense theory that the shooting was an accident. Rather, Lattyak's testimony would have likely undermined this defense theory. Specifically, Lattyak testified that he examined the 12-gauge Mossberg shotgun Rosas used to murder Stockmann. Although Lattyak believed that the shotgun trigger was "slightly lighter" than most guns, he added that it was not significantly so. Moreover, Lattyak testified that the shotgun Rosas used did not have a "hair trigger" and that "you'd have to have a definite pull on that trigger" in order for the gun to fire. Lattyak further testified that the shotgun was a pump-action. To fire the shotgun, Lattyak explained, the safety would have to be disengaged, a round loaded, and the gun manually pumped.

Additionally, Rosas testified that he pulled the gun's trigger, not that it fired on its own accord. And Pusich testified at the evidentiary hearing that she considered and rejected the idea of calling a ballistics expert to testify at trial because it would not have explained the second shot Rosas fired at Stockmann that was not an accident.

Lattyak's testimony supported the conclusion that deliberate action was necessary to fire the shotgun. Rosas failed to demonstrate that he was prejudiced by Lattyak's absence as a witness at his trial. Pusich's decision not to call a ballistics expert to testify was a reasonable strategic decision. We conclude that the district court properly denied Rosas relief on this claim.

#30, Ex. 79, at 5-6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* and following authority.

While acknowledging Lattyak's testimony that the shotgun did not have a hair trigger, petitioner focuses on testimony that the trigger pull "was on the lighter side of the Mossberg shotguns," and that of 28 "other weapons" on a trigger-pull chart "only three on the chart were a lighter trigger than the weapon that killed Stockman."[10]

Petitioner's selective focus glosses over clear and unequivocal testimony by Lattyak that, consistently and repeatedly, debunked any notion that the shotgun's trigger pull – in and of itself – supported an accidental shooting claim. Lattyak testified that the 12 gauge pump-action shotgun had a trigger pull of three-and-a-half pounds. On a trigger-pull chart of 28 *Mossberg* shotguns, there were only three models with a lighter trigger pull, but Lattyak did not conduct a similar specific comparative analysis as against the trigger pull of shotguns generally. Lattyak testified that from his personal

_____

[10]#48, at 13.

-14-

knowledge of Remington and other brand shotguns, the typical trigger pull was around four pounds and above. The trigger pull on the shotgun in question was "slightly lighter than that, but not significantly."[11] Lattyak testified that "a three and a half pound trigger pull is not something that I would take issue with," that "[i]t wouldn't affect me in any way, shape or form as far as safe operation," and that "as far as the safe operational standpoint of that gun, I think it would be acceptable."[12]

Lattyak thereafter repeated in his testimony: "I wouldn't consider it unsafe, and it should operate normally."  And he again repeated, similarly: "Oh, no.  No, I wouldn't consider it unsafe."[13]

Lattyak expanded on the point by comparing the trigger pull on the Mossberg to that of a standard-issue revolver in single action:

> I'll give you an example.  This trigger pull, three and a half pounds, would be what a Smith and Wesson revolver coming out of the factory, in the single action mode, would fire at.  So although it may be on the lighter side for a shotgun, for other firearms, it may be a very standard trigger pull.  And it's certainly not something that you would just simply breathe on, like a hair trigger or something, and it would go off.
>
> THE COURT: Is it designed, as far as you know, to have at least enough resistance so that depression of the trigger has to be intentional?
>
> THE WITNESS: Yes your honor.
>
> I actually called the factory – and, of course, it's Mossberg for this particular gun – and I talked to some of the people in the service department, and they like to see the guns coming out between four and nine pounds.  So it's a pretty wide range.  This is certainly under that [as were three other Mossberg models that also – came from the factory – below that figure per Lattyak's testimony], but, again, I think you'd have to have a definite pull on that trigger.  And I wouldn't consider it a hair trigger by any stretch of the imagination.

#29, Ex. 70, at 100-01.

Clearly, nothing in Lattyak's testimony – regarding the shotgun itself – supported a theory that the first shot was accidental.  His testimony, regarding the shotgun itself, instead belied such a claim.

---

[11]#29, Ex. 70, at 91-96.

[12]#29, Ex. 70, at 98-99.

[13]*Id.*, at 99.

Petitioner nonetheless urges:

> . . . . Additionally, Lattyak testified that if someone had a nervous or medical condition that the trigger might be affected. (Id.) Expert testimony established that Rosas was suffering from a full-blown PTSD episode at the time of the shooting of Stockman. (Ex. 71, p. 59.) A jury could have reasonably concluded that Rosas's unstable mental capacity amplified the gun's already light trigger. Lattyak's testimony would have added credibility to the accidental shot theory and would have reasonably affected the jury's guilt determination.

#48, at 13.

Federal habeas counsel misrepresents Lattyak's testimony.

Lattyak did *not* testify that, in his expert opinion, "if someone had a nervous or medical condition that the trigger might be affected." Lattyak instead testified:

> . . . . I think with most people, it wouldn't [be an issue]. For everybody, maybe somebody with a nervous condition or some medical condition, *that'd totally be something I couldn't even testify to.* . . . .
>
> . . . . .
>
> Q:  *I guess it would be purely speculative*, but I'm wondering if you would have the same opinion if someone was, like you said, maybe on the nervous side or intoxicated or it was in the dark. There's a lot of factors that would weigh in. Would that be fair?
>
> A:  Oh, certainly. *Again, I'm not a medical doctor. So nervous conditions and how people react is something I can't testify to*, and that may be a factor. *I can only tell you about the operation of the gun.*

#29, Ex 70, at 99 & 101 (emphasis added).

Express testimony by an expert that he cannot testify to something that clearly is beyond his expertise does not constitute competent evidence of anything, much less does it demonstrate a reasonable probability that the outcome of a trial would have been different if defense counsel had presented such equivocal testimony. Speculation as to what possibly might be the case clearly is not sufficient to carry a petitioner's burden of proof on federal habeas review.

The psychological expert testimony presented at the state court evidentiary hearing similarly did not provide competent evidence supporting a claim that "a full-blown PTSD episode" "amplified the gun's already light trigger," which was the same or heavier than the trigger pull on other factory-issue firearms. The psychologist, Dr. Mahaffey, provided absolutely no testimony – even assuming that she

-16-

would have been a competent witness to so testify – that Rosas was more likely to accidentally pull a trigger with a three-and-a-half-pound trigger pull because of PTSD.  She testified that prior to the time of the offense, not merely on the evening of the offense itself, Rosas' post traumatic stress disorder had been reactivated.[14]  And she testified that he then sustained an acute stress disorder episode in *reaction to* the first shot, regardless of whether the then-already-fired shot was accidental or intentional.[15]  But she provided no testimony – assuming that she was competent to do so – that PTSD, "full blown" or otherwise, made Rosas more likely to accidentally pull a trigger with an otherwise undeniably safe trigger pull.  Indeed, Dr. Mahaffey expressly made no determination that the first shot was accidental, and she also expressly acknowledged that none of her findings necessitated a conclusion that the first shot was accidental.[16]

Unbridled speculation does not suffice to sustain a petitioner's burden of proof on federal habeas review.  Only such speculation, and not competent evidence, undergirds petitioner's suggestion that "Lattyak's testimony would have added credibility to the accidental shot theory and would have reasonably affected the jury's guilt determination."  Neither the firearms expert testimony nor the psychological expert testimony presented at the state court evidentiary hearing, whether singly or in combination, supports such a bare assertion.

The state supreme court's rejection of this essentially unsupported, speculative claim was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 3(B) therefore does not provide a basis for federal habeas relief.[17]

---

[14]#29, Ex. 71, at 36-37 & 56-57.

[15]*Id.*, at 58-63 & 104.

[16]*Id.*, at 58-59, 90, 93 & 100.

[17]Again, the fact that the Court considers only the prejudice prong does not constitute an implicit holding that petitioner can satisfy the performance prong.  Petitioner must demonstrate both deficient performance and resulting prejudice.  The failure to demonstrate one, either one, eliminates a need to address the other.

The Court notes -- strictly in passing -- that actors *portraying* military and law enforcement personnel on occasion are depicted in movies running around with their finger on the trigger, while carrying screen weapons that in actuality are loaded with, at most, blank rounds.  However, video images of actual military and law enforcement

(continued...)

***Testimony by Janet Cordova – Ground 3(C), part***

In Ground 3(C), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to call his former fiancée or girlfriend, Janet Cordova, during both the guilt and penalty phases.

The state district court denied this claim following an evidentiary hearing at which petitioner presented testimony from Cordova.

### Guilt Determination

On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> 3.   Failure to call former girlfriend Jane Cordova as a witness
>
> Rosas thirdly contends that the district court improperly denied his claim that Pusich was ineffective for failing to call his former girlfriend, Jane Cordova, as a witness. Rosas maintains that Cordova's testimony would have corroborated his theory of defense by providing facts about his personality, his relationship with Stockmann, and his behavior before and after Stockmann's death.
>
> The district court found that Pusich made a reasonable strategic decision not to call Cordova as a witness and that Rosas failed to show that he was prejudiced by her absence from his trial. We agree.
>
> Our review of Cordova's testimony at the evidentiary hearing reveals that she would have provided testimony at trial that may have assisted Rosas's defense, but also hurt it. For example, Cordova would have testified about Rosas's behavior both before and after Stockmann's murder and that Rosas told her that he accidentally shot and killed Stockmann. Yet Cordova would have also testified that Rosas lied to her,

---

[17](...continued)

personnel, such as images of active duty military personnel deployed overseas, instead virtually invariably show the personnel with the index finger fully extended on the outside of the trigger guard rather than on the trigger itself, and with the muzzle pointed safely either down or up, as per standard military weapons-handling training. Fundamental safety rules mandate, *inter alia*, that the index finger remains fully extended and off the trigger unless and until one intends to – immediately – fire the weapon, with eyes then on target. Individuals following such training thus simply do not run around with their finger actually on the trigger of a weapon and thereby "accidentally" shoot people as a matter of course. Rosas had been in the United States Army for a year and had been trained by the Army in the use of firearms. See,e.g., #25, Ex. 28, at 24-25,78 & 92-93; #29, Ex. 70, at 131-32; *id.*, Ex. 71, at 23 & 80.

The Court further would note here as well that, for felony murder, the State was required to prove that Rosas had the specific intent only to commit kidnapping, an offense already well underway, prior to the first, allegedly "accidental," shot. See text, *supra*, at 8 & n.2.

1    he had specifically plotted to murder Stockmann, and he originally
     intended to stab Stockmann in the neck with a knife.
2
              Pusich had interviewed and subpoenaed Cordova prior to trial.
3    However, Pusich ultimately concluded Cordova's testimony would be
     more damaging than helpful and, thus, decided not to rely on her as a
4    witness.   Pusich informed Rosas of this decision and, according to
     Pusich, he acquiesced.
5
              Pusich's decision not to call Cordova as a witness was a matter
6    of   reasonable   trial   strategy   that   does   not   support   an
     ineffective-assistance-of-counsel claim.   Moreover, Rosas failed to
7    demonstrate a reasonable probability that he was prejudiced by the
     omission of Cordova's testimony at trial.  For these reasons, we conclude
8    that the district court properly denied Rosas relief on this claim.

9    #30, Ex. 79, at 6-7.

10        The state supreme court's rejection of this claim was neither contrary to nor an unreasonable

11   application of clearly established federal law.

12        Petitioner contends, as to the guilt phase, that trial counsel was ineffective because Cordova

13   would have presented evidence to support Rosas' mental state, intoxication, and coercion defenses.

14        At the very outset, the evidentiary hearing testimony upon which petitioner relies includes

15   testimony by Cordova that quite possibly would not have been admissible at trial.  For example,

16   petitioner relies upon hearing testimony by Cordova that Rosas told her on the day after he killed

17   Stockmann that the first shot was an accident and that Linton coerced him into the second shot by

18   saying that she would harm Cordova and Rosas' daughter if he did not do it.  Such testimony likely

19   would have been inadmissible hearsay.  Such statements likely would not have been admissible as prior

20   consistent statements because Rosas already had a motivation to fabricate when he, allegedly, made the

21   statements to Cordova.  *See, e.g., Runion v. State*, 116 Nev. 1041, 1052-53, 13 P.3d 52, 59-60

22   (2000)(defendant's alleged statement to his girlfriend a few days after the shooting that he fired in self-

23   defense was not admissible as a prior consistent statement because, while he had not yet been arrested,

24   he had a motive to fabricate as soon as he shot the victim).  The inculpatory admissions that Rosas made

25   to Cordova, on the other hand, were an entirely different matter and clearly would have been admitted

26   against him.

27        To the extent that Cordova could have presented admissible guilt phase testimony for the

28   defense, the state supreme court's holding that petitioner failed to demonstrate deficient performance

-19-

1   was neither contrary to nor an unreasonable application of *Strickland* and following authority.

2       Where the state court has decided the performance issue, the federal court's review of counsel's

3   decisions must be highly deferential:

5           In *Strickland*, . . . [t]he Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.

7           Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *ibid.*, the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.*, at 690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.*, at 688, 104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id.*, at 690, 104 S.Ct. 2052.

13         . . . . .

14           The [reviewing court must not overlook] "the constitutionally protected independence of counsel and ... the wide latitude counsel must have in making tactical decisions." 466 U.S., at 689, 104 S.Ct. 2052. Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.*, at 688, 104 S.Ct. 2052. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions ...." *Id.*, at 688–689, 104 S.Ct. 2052. *Strickland* itself rejected the notion that the same investigation will be required in every case. *Id.*, at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" (emphasis added)). It is "[r]are" that constitutionally competent representation will require "any one technique or approach." [*Harrington v. Richter*, 562 U.S. ——, ——, 131 S.Ct. 770, 779, 178 L.Ed.2d 624 (2011)] . . . . .

22         . . . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons . . . counsel may have had for proceeding as they did" . . . .

26   *Pinholster*, 131 S.Ct. at 1403 & 1407.

27       Weighing the relative pros and cons of putting a particular witness on the stand is a classic

28   tactical decision. Experienced trial lawyers understand that the potential harm from a witness'

1    testimony can outweigh even an undeniable benefit from their testimony.  In all probability, if trial

2    counsel instead had put Cordova on the stand and the State then had used her testimony to further

3    bolster key points in its case, petitioner then would be arguing that he was denied effective assistance

4    of counsel because counsel called a witness that the State then used to help make its case against him.

5    The "doubly deferential" standard of review applicable in this context precludes just such *post hoc*

6    "damned if you do, damned if you don't" situations where a tactical decision by counsel weighing

7    relative benefits and costs then becomes – whichever way the decision is made – a potential basis for

8    overturning the conviction years later by a petitioner second-guessing the alternative taken.  On federal

9    habeas review, petitioner focuses only on the potential benefit from Cordova's testimony and not on

10   the potential harm from having a witness called by the defense helping make the State's case.  Such a

11   *de novo* re-weighing of the risk-reward balance, at least a successful one, is precluded under *Strickland*,

12   given that strategic choices made after investigation are "virtually unchallengeable."  *Strickland*, 466

13   U.S. at 690, 104 S.Ct. at 2066.

14          Further, the state supreme court's holding that petitioner failed to demonstrate resulting

15   prejudice was neither contrary to nor an unreasonable application of clearly established federal law.

16   The state supreme court's determination that there was not a reasonable probability that calling Cordova

17   to bolster petitioner's mental health, intoxication, and coercion defenses would have altered the

18   outcome at trial was not objectively unreasonable.

19          With respect to the purported mental health defense, as discussed *supra* regarding Ground 3(A),

20   petitioner's psychologist, Dr. Mahaffey, testified, after having, *inter alia*, viewed or reviewed Cordova's

21   state evidentiary hearing testimony,[18] that: (a) petitioner "could distinguish right from wrong," had the

22   capacity to make voluntary choices, and "had capacity for deliberation;" (b) she "did not conclude that

23   he lacked capacity for premeditation;" and (c) she could not rule out the conclusion that Rosas formed

24   the specific intent to kill.  See text, *supra*, at 11-12.  The state supreme court's determination that there

25   was not a reasonable probability that Cordova's testimony would have altered the outcome at trial when

26   presented to support a mental health defense culminating with such expert testimony clearly was not

27   an objectively unreasonable application of *Strickland*.

28

[18]See,e.g., #29, Ex. 71, at 29, 38, 54, 60, 66 & 86.

With respect to a purported intoxication defense, as discussed *infra* regarding Ground 3(D), the state supreme court's determination that petitioner failed to demonstrate that such a defense had a reasonable probability of altering the outcome at trial was not an objectively unreasonable application of *Strickland*.  The Court notes in this regard that – *with regard to the night of the shooting* – Cordova's testimony was, at best, inconclusive regarding the amount of alcohol consumed by Rosas prior to leaving with Stockmann and Linton.  According to Cordova's testimony, she and Rosas had agreed that they were not going to drink that evening, although both did to an extent.  She could testify with certainty only that Rosas had two mixed lemonade drinks because she saw him with one when he left and he had been drinking one prior to that.  Cordova of course could not testify from personal knowledge regarding Rosas' alcohol consumption, if any, during the several hours after Rosas and the others left.  The state supreme court's determination that there was not a reasonable probability that Cordova's testimony would have altered the outcome at trial when presented to support an intoxication defense -- particularly given the applicable Nevada law and the expert testimony presented at the state evidentiary hearing -- was not an objectively unreasonable application of *Strickland*.[19]

With regard to a purported coercion defense, petitioner's late-breaking – in terms of articulation to a court – coercion theory based upon Cordova's hearsay testimony is problematic for a number of reasons.

*First*, the late-breaking coercion theory based upon Cordova's hearsay testimony conflicts with Rosas' own actual trial testimony, both as to what Linton said and as to, indeed, whether he feared Linton at all.

In her 2004 state evidentiary hearing testimony, Cordova testified that Rosas said that Linton said that Linton would harm Cordova and Rosas' daughter if he did not shoot Stockman a second time.[20]

---

[19]#29, Ex. 70, at 62-64, 67, 70-71 & 75.

[20]#29, Ex. 70, at 88, 103-04, 106, 109, 133 & 134-35.  Cordova did *not* testify unequivocally at the state evidentiary hearing that she told defense counsel everything that she testified to at the hearing.  *Id.*, at 123-24.  Trial counsel, on the other hand, did not refer during her hearing testimony to Cordova's possible testimony as including any such testimony by Cordova that Rosas said that Linton said that she would harm Rosas' daughter and/or Cordova if he did not shoot Stockmann a second time.  *Id.*, at 139-43, 145-47, 167-70 (the Gabriella referenced is not Rosas' daughter).

(continued...)

-22-

1    In his 2000 trial testimony, however, Rosas – who then was on trial for first-degree murder –

2    did not testify that Linton made any such statement threatening Cordova and/or his daughter:

3
          Q:     What was said?
4
          A:     She told me "Shoot him in the head."
5         Q:     Did you do that?

6         A:     (Nods head.)

7         Q:     You're nodding your head?

8         A:     Yes.

9         Q:     Is that yes?  Why did you do that?

10        A:     I don't know.

11   #25, Ex. 28, at 79.

12        Thereafter, during the ensuing cross and redirect, Rosas had multiple opportunities, in response

13   to open-ended questioning, to testify – if he believed that that is what occurred – that Linton coerced

14   him by threatening his daughter and/or Cordova.  Each time, he testified in substance as above, *i.e.*, that

15   Linton told him to shoot Stockmann in the head and that he did so without a specific reason why.  He

16   never testified, in response to numerous open-ended queries, that Linton said that she would hurt his

17   daughter and/or Cordova if he did not shoot Stockmann a second time.[21]

18        Indeed, Rosas specifically *denied being afraid of Linton*:

19        Q:     Were you afraid of her?

20

21       [20](...continued)

22       The late-breaking story appears for the first time – in a presentation to a court – in a January 28, 2003, filing by
state post-conviction counsel with an attached affidavit memorializing post-conviction counsel's telephone interview

23   with Cordova. #27, Ex. 59.  Prior to this point, Rosas' post-conviction filings asserted that Rosas was afraid for *his own
life* and that Cordova would testify, *inter alia*, "that he complied with Ms. Linton's direction because he was afraid for

24   his life."  See, e.g., #26, Ex. 58, at 50, 54 & 55.

25       This Court has not been directed to any contemporaneous material – such as witness interview notes or a police
report of a witness interview – from prior to trial reflecting that Cordova relayed this particular account to anyone prior

26   to trial.  While the Court makes no finding as to what Cordova told defense counsel prior to trial, the Court does note
that this particular embellishment on Rosas' succession of inconsistent stories does not surface in a presentation to a

27   court until years after the trial.

28       [21]#25, Ex. 28, at 91-92, 97-98 & 100-101.

-23-

| | | |
|---|---|---|
| A: | In a sense when she told me that – about the killings and stuff like that, but not really 'cause, I mean, I don't – I don't mean it as in a feminist way, but I don't really take much fear towards females. | |
| Q: | Were you under the impression that she had experience in these sorts of things? | |
| A: | Yes. | |
| Q: | Why did you listen to her? | |
| A: | I figure she was telling the truth. | |

#25, Ex. 28, at 101.

The late-breaking Cordova post-conviction testimony thus represents yet another story offered by Rosas that embellishes upon his multiple prior versions of the event and that further is inconsistent not only with his prior stories but also with his trial testimony as well.

*Second*, the alleged "coercion" involved provides absolutely no valid justification under Nevada law for shooting the possibly still-living victim in the head. *Rosas* had the shotgun. Linton was *unarmed*.[22] The only – remotely conceivably – justifiable homicide under Nevada law based upon a threat to harm another would be to kill *the person making the threat* and then only if "there is imminent danger of such design being accomplished." N.R.S. 200.160. Rosas thus could not shoot *anyone* based upon an alleged threat by the unarmed Linton to harm others miles away, much less could he shoot a defenseless and innocent victim laying on the ground who Rosas already had shot once. Petitioner's whole moving premise that alleged "coercion" by Linton "negated" his own specific intent or otherwise justified his killing of Stockmann under Nevada law is – utterly and completely – fallacious.

The state supreme court's determination that there was not a reasonable probability that Cordova's testimony would have altered the outcome at trial when presented to support a purported coercion defense was not an objectively unreasonable application of *Strickland*.

Accordingly, with respect to possible Cordova testimony regarding all three purported defenses, the state supreme court's determination that petitioner had not established prejudice was not an objectively unreasonable application of clearly established federal law. At bottom, the purported

---

[22]#25, Ex. 28, at 102.

-24-

defenses had virtually nil chance of success, whether viewed singly or together, with respect to the guilt determination at trial.  Ground 3(C) therefore does not provide a basis for federal habeas relief with respect to the guilt determination.[23]

### Penalty Phase

The Court discusses all claims pertaining to the noncapital penalty phase of the proceedings together at one time, *infra*.

### Intoxication Defense – Ground 3(D)

In Ground 3(D), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to call a substance abuse and alcohol blackout expert during the guilt determination in support of a voluntary intoxication defense to the specific intent offenses and failed to proffer a corresponding "theory of defense" jury instruction.

The state district court denied this claim following an evidentiary hearing at which petitioner presented testimony from Mary Sorenson, a drug and alcohol counselor.

On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> 4.   Failure to call psychologist Dr. Mary Sorenson as a witness
>
> Rosas also contends that the district court improperly denied his claim that Pusich was ineffective for failing to call Dr. Mary Sorenson, a psychologist, to testify as an expert witness.  Dr. Sorenson testified during the evidentiary hearing that Rosas suffered from "fragmentary blackouts" that were induced by his alcohol use and opined that Rosas experienced such a blackout on the night he killed Stockmann.  Dr. Sorenson's testimony, Rosas contends, would have supported a "voluntary intoxication" defense and negated the specific intent element for firstdegree murder and kidnapping.
>
> The district court found that Dr. Sorenson's opinions were based upon statements made to her by Rosas over three years after his trial and that these statements lacked credibility.  Even if Dr. Sorenson had

---

[23] Petitioner's reliance in the reply on circuit cases involving federal petitions filed prior to the effective date of AEDPA is unpersuasive.

The Court further would note here as well that, for felony murder, the State was required to prove that Rosas had the specific intent only to commit kidnapping, an offense already well underway, prior to, both, shots.  See text, *supra*, at 8 & n. 2.

1
2

testified during the trial, the district court also found there was no reasonable probability that her testimony would have altered the outcome. We agree.

3
4
5

Our review of the record reveals that Rosas's claim that he suffered from "fragmentary blackouts" on the night he murdered Stockmann was unsupported by his own trial testimony-he testified to remembering events before, during, and after the murder. Not once did Rosas claim that he blacked out due to alcohol consumption.

6
7
8
9

Moreover, Pusich testified at the evidentiary hearing that Rosas gave her no reason to believe he suffered from any such blackouts. And although Dr. Sorenson's testimony that Rosas suffered from "fragmentary blackouts" could, perhaps, be relevant to Rosas's memory after the murder, Rosas failed to demonstrate that it was relevant to whether he had the requisite intent to actually commit the crimes.

10
11
12

Rosas failed to demonstrate any probability of success of a defense based on voluntary intoxication and that he was prejudiced by the absence of Dr. Sorenson as a witness. He also failed to demonstrate that Pusich's decision not to pursue the possibility that he suffered from "fragmentary blackouts" was unreasonable. We conclude that the district court properly denied Rosas relief on this claim.

13   #30, Ex. 79, at 6-7.

14   The state supreme court's rejection of this claim was neither contrary to nor an unreasonable

15   application of *Strickland* and following authority.

16   At the outset as to this ground, the state supreme court accorded the witness more credentials

17   than she claimed or was due.  Sorenson was not a psychologist.  She did not hold a Ph.D.  Indeed, she

18   did not have any educational degrees at all.  Her sole relevant credential was that she was a licensed

19   drug and alcohol counselor and had been a counselor for eleven years.[24]

20   Sorenson did not evaluate Rosas at any time prior to trial.  She instead interviewed him on two

21   occasions in 2003 and 2004, well after trial.[25]

22   Sorenson testified that she believed that Rosas experienced a "fragmentary blackout" on the

23   night that he shot Stockmann twice based exclusively on what Rosas himself told her:

24
25

Q:    So if you had testified at the trial, even though there's no compilation of testing data, no idea what the defendant

26

27   [24]#29, Ex. 70, at 9-10 & 29-30.  Petitioner has represented Sorenson's credential accurately herein.

28   [25]E.g., *id.*, at 11 & 13.

1                would've said to you back at the time of the trial in 2000,
2                you would've come to a conclusion that he suffered from
                  fragmentary blackout?

3      A:     From his description of what happened to him, yes.

4                     . . . . .

5      Q:     And your conclusion that he suffered fragmentary
6                blackout on the night of the murder is simply based on
                  what he told you?

7      A:     *Right.  That's all you can base it on*.

8                     . . . . .

9      A:     I do my basis on the interview of the patient.

10 #29, Ex. 70, at 23-25 & 31 (emphasis added).  See also *id.*, at 19, 20-21 & 34-35.

11      Sorenson ultimately admitted during her testimony that, while she herself believed Rosas to be

12 truthful, she at bottom had no way of knowing whether he was being truthful – whether about the

13 particulars of his substance abuse generally, about his substance abuse on the evening in question,

14 and/or about his account of the events on the evening in question.[26]

15      Sorenson further did not base her opinion upon information reliably establishing Rosas' alcohol

16 intake on the evening in question.  Nor could she even reliably identify at the hearing what information

17 she relied upon in this regard.  Sorenson said that Rosas said that he started drinking five hours before

18 the shooting, but he could not remember in what intervals and in what amounts he had been drinking.[27]

19 Her testimony continued as follows:

20      Q:     So he could've just had two beers and one shot of hard
21                liquor then?

22      A:     According to what I read --

23      Q:     Well, what did he tell you?

24      A:     He didn't remember how much he had to drink.

25      Q:     So what did you read?

26 _____

27    [26]#29, Ex. 70, at 41-42 & 44-45; see also *id.*, at 34 & 38.

28    [27]#29, Ex. 70, at 14-15 & 23-24.

A:   That according to his girlfriend, he'd been drinking heavily that evening.

Q:   So you read a statement from somebody?

A:   Yeah.

Q:   Where did you get that?

A:   It was in one of the reports.

Q:   A police report?

A:   I think it was one of the court reports.

Q:   Was it a report from the investigator to the defense?

A:   Well, I can't remember where I read it. But also, with his past history [as to which Rosas himself was the source], he always drank until he got drunk and passed out, he never drank one or two beers.

Q:   So it's impossible that he would've done it on this occasion?

A:   I assume so. I'm not sure.

#29, Ex. 70, at 24-25.

Of course, as discussed *supra* with regard to Ground 3(C), the girlfriend, Janet Cordova, did *not* testify at the evidentiary hearing that she observed Rosas drinking heavily. Cordova could testify with any certainty only that Rosas had two mixed drinks over the course of the evening.

This Court is not sanguine that, in a federal criminal trial, the Court would have admitted the above testimony over an objection under Rule 702 of the Federal Rules of Evidence. The "expert" testimony appeared to apply no methodology other than to take at face value the after-the-fact report of a convicted murderer then sentenced to, *inter alia*, four consecutive life sentences without the possibility of parole who already had lied multiple times regarding the incident trying to avoid culpability. The only protocol relied upon by the witness to rule out the – hardly remote – possibility that Rosas might be skewing his report to her of his past history to get out of jail was her own, purely subjective and untested, belief that he was telling her the truth. Further, the expert could not even identify the material that she relied upon to establish the – hardly inconsequential – matter of how much alcohol Rosas had on the critical night in question. The witness that Sorenson did refer to did not in

-28-

1  fact testify to the heavy drinking that the expert recalled seeing reported by the witness.  Even allowing

2  for the constitutional right to present a defense, this Court would have little difficulty concluding in a

3  federal criminal trial on similar facts that the testimony was not based upon sufficient facts or data, that

4  the testimony was not the product of reliable principles or methods, and that, to the extent that any

5  principles or methods *arguendo* were involved, the witness had not applied any such principles and

6  methods reliably to the facts of the case.  *Cf. United States v. Curtin*, 588 F.3d 993, 998 (9th Cir.

7  2009)(affirming exclusion of defense expert testimony under *Daubert* gatekeeping function).

8       The state supreme court's determination that Rosas failed to demonstrate a reasonable

9  probability that, but for the failure to present such weak testimony, the outcome of the trial would have

10  been different clearly was not an objectively unreasonable application of *Strickland*.

11       Petitioner further failed to present evidence sufficient to support the giving of a voluntary

12  intoxication defense jury instruction under the governing Nevada law.  Evidence merely that a defendant

13  consumed intoxicants, without more, is insufficient to establish a viable voluntary intoxication defense

14  under Nevada state law.  As explained by the Supreme Court of Nevada in *Nevius v. State*:

15          It is true that voluntary intoxication may negate specific intent,
and an accused is entitled to an instruction to that effect if there is some
16  evidence in support of his defense theory of intoxication.  *See, e.g.,
Williams v. State*, 99 Nev. 530, 665 P.2d 260 (1983).  Here, however,
17  there was no evidence presented at the guilt phase to the effect that
appellant was intoxicated at the time of the killing.  The evidence
18  showed only that he consumed intoxicants: David Nevius testified that
the four men had a bottle of wine with them before the burglary, and that
19  appellant had smoked marijuana.  In order for a defendant to obtain an
instruction on voluntary intoxication as negating specific intent, the
20  evidence must show not only the defendant's consumption of intoxicants,
but also the intoxicating effect of the substances imbibed and the
21  resultant effect on the mental state pertinent to the proceedings.  *See
State v. Bourdlais*, 70 Nev. 233, 265 P.2d 761 (1954)(decided under
22  precursor of NRS 193.220); *State v. Boyles*,112 Ariz. 63, 537 P.2d 933
(1975); *see also People v. Harris*, 28 Cal.3d 935, 171 Cal.Rptr. 679, 623
23  P.2d 240 (Cal.), *cert. denied*, 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d
192 (1981). The instruction on voluntary intoxication [therefore] was
24  properly refused.

25  101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985).

26       In the present case, Rosas never presented the state courts with reliable evidence as to the

27  amount of intoxicants consumed, the intoxicating effect of the substances consumed, and the resultant

28  effect on the pertinent mental state.  It was for this very reason – the lack of reliable evidence required

1    for the threshold showing – that trial counsel did not pursue the defense further than she did.[28]   The

2    weak and unreliable expert testimony presented at the state evidentiary hearing would not have altered

3    that situation in any substantial respect if it instead had been presented at trial.

4           Ground 3(D) therefore does not provide a basis for federal habeas relief.

5           ***Abandonment Defense – Ground 3(E)***

6           In Ground 3(E), petitioner alleges that he was denied effective assistance of counsel when trial

7    counsel failed to question him competently regarding his alleged abandonment of the intent to commit

8    murder and to offer a jury instruction in support of the defense.

9           The state district court denied this claim following an evidentiary hearing at which defense

10   counsel testified.

11          On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim presented

12   to that court on the following grounds:

13

14         [28] See #29, Ex. 70, at 158.  Trial counsel referred to her having litigated, and lost, the same issue before Rosas'
       trial, in a case she identified as *Chambers*.  Petitioner suggests that the case in question was *Chambers v.State*, 113 Nev.

15     974, 944 P.2d 805 (1997).  He urges that *Chambers* demonstrates that counsel acted unreasonably in not pursuing the
       defense because the state supreme court vacated the death sentence, although upholding the conviction, because of

16     evidence of voluntary intoxication.  Over and above the fact that the State did not seek the death penalty in Rosas' case,
       and the further fact that Ground 3(D) is directed to the guilt determination, the cases in any event are wholly dissimilar

17     with regard to the underlying facts.  In *Chambers*, "the murder was not planned in advance" and resulted from an
       immediate, "emotionally charged confrontation."  113 Nev. at 985, 944 P.2d at 812.  In the present case, in sharp

18     contrast, Rosas lured the victim to a remote location pursuant to an advance plan to kill him and there was absolutely no
       confrontation before Rosas shot the victim first in the back and then a second time in the head.

19
           In all events, there was not sufficient threshold evidence in Rosas' case *to present a viable intoxication defense*
20     *vis-à-vis, inter alia, the level of intoxicants consumed*.  That was the key point behind counsel's approach to the issue,
       and nothing in *Chambers* is contrary to that assessment.  Lack of a requisite threshold showing means exactly what it
21     says – there was not sufficient evidence to even mount a viable defense on this basis under Nevada law.  Sorenson's
       exceedingly weak post-conviction testimony does not remotely establish to the contrary.
22
           Petitioner further refers to the fact that Chambers later was granted relief by the Ninth Circuit due to a faulty
23     jury instruction on the elements of first-degree murder.  As discussed at length *supra*, there is no such claim of jury
       charge error in this case that has been exhausted and presented on the pleadings in this case.  Moreover, the jury
24     instruction used in this case was completely different from the charge used in *Chambers*.  See note 3, *supra.*

25         The Court trusts that federal habeas counsel is not seeking by these repeated and otherwise wholly unnecessary
       references to a jury charge error presented in other cases of the same general time period to imply that there is a
26     fundamental jury charge error in this case lurking underneath the otherwise weak claims presented herein that otherwise
       would provide a basis to vacate the conviction but for sundry procedural bars.  Given the jury charge actually given in
27     this case, such an implication would be as unwarranted as it would be irrelevant to the only properly-presented issues in
       this case.
28

                                                                -30-

6.    <u>Failure to adequately examine Rosas</u>

Rosas further contends that Pusich failed to adequately examine him while he testified at trial and to develop a defense theory that he abandoned his intent to kill when he did not stab Stockmann with a knife in the neck as originally planned.

The district court found that Pusich's decision not to pursue an "abandonment defense" was reasonable and that such a defense had no reasonable probability of success. We agree.

Rosas murdered Stockmann by shooting, not stabbing. Even if Rosas abandoned his original plan to stab Stockmann with a knife, as he claimed, this does not establish that he abandoned his specific intent to murder him. It only shows that Rosas altered his method of doing so.

Moreover, this court concluded on direct appeal that sufficient evidence supported the jury's verdict that Rosas murdered Stockman with the requisite specific intent to support a theory of first-degree murder. Rosas has failed to demonstrate that an abandonment theory of defense had any probability of success. Pusich's decision not to advance such a defense was reasonable. We conclude that the district court properly denied Rosas relief on this claim.

#30, Ex. 79, at 9-10.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* and following authority.

In his trial testimony, Rosas acknowledged, grudgingly, that Cecile Linton and Ed McQueen had testified truthfully as to the plan for killing Stockmann that he and they had discussed.[29] Under that plan, they would entice Stockmann to drive them into a remote area of California with the lure of directing him to his stolen truck. While Stockmann was driving the car, Rosas then would slit his throat with a knife from behind him in the back seat. Linton would grab the wheel from the passenger side and control the car while Rosas slit Stockmann's throat.[30]

While McQueen was too intoxicated to ride along that evening, Rosas and Linton followed through with the plan and lured Stockmann out to the remote area in California. According to his testimony, however, Rosas "lost his nerve" and could not go through with slitting Stockmann's throat. Rosas at least had not done so up to the point that, according to Rosas, Stockmann decided to pull over

---

[29]#25, Ex. 28, at 70-73 & 87-90.

[30]*Id.*, at 33-35, 38-39 & 46-57 (Linton).

1   and then retrieved the shotgun from the back of the car.  Rosas undeniably had the knife that was

2   intended to be used for the murder with him the whole time.[31]

3          Petitioner cites no apposite Nevada case authority establishing that a defendant even can get a

4   jury instruction, much less present a viable defense, based upon alleged abandonment of intent grounded

5   solely upon a well-after-the-fact declaration that he internally "lost his nerve" to kill the victim one way

6   although he then killed him through another means.  Indeed, petitioner can muster citations to only a

7   smattering of cases addressing abandonment, including a 1969 Nevada case, California cases from 1935

8   and 1960,  and a nearly century old Ninth Circuit decision from 1916.[32]  All of these cases involved

9   inchoate attempted offenses, not a completed murder.  The defendants in the cases were able to show

10  that they had not yet committed the attempt by taking overt action in furtherance of the attempt.  They

11  further showed that they took affirmative, definitive *action* demonstrating the abandonment of their

12  intent, such as relinquishing the intended murder weapon to another or leaving the scene of a planned

13  rape.

14         Petitioner cites no apposite Nevada case law holding that a defendant can establish abandonment

15  of intent simply by declaring after the fact that "in his heart of hearts" he had lost his nerve, despite

16  having already lured the victim to the remote area intended for the killing, despite in truth still being

17  in position to kill the victim with the originally intended weapon still being in his possession, despite

18  not telling his confederate that he allegedly had abandoned his intent, and despite never warning the

19  intended victim, which thereby would have actually ended any chance that he might in an instant

20  "rediscover" his nerve and slash the victim's throat during the still-continuing opportunity to do so.

---

[31] #25, Ex. 28, at 73-76 & 90.  Federal habeas counsel at one point urges that Rosas "even told Stockman to stop the car," as an alleged  reflection of abandonment of his intent.  #48, at 19, line 20; but see *id.*, at 18, lines 11-13 ("in fact told Stockman *not* to stop the car")(emphasis added).  At trial, Rosas testified that it was Stockman's idea to stop the car, and he stated:  "I didn't want to even stop on the side of the road."  #25, Ex. 28, at 74-75.  The stopping of the car was in no sense a reflection of any step taken by Rosas in abandonment of his intent to kill Stockmann.

[32] *Stewart v. State*, 85 Nev. 388, 389, 455 P.3d 914, 914-15 (1969)(defendant failed to show that he effectively abandoned his intent to commit robbery when he put down his pistol and left the station because the attempted robbery was completed when he produced his pistol and demanded the money); *People v. Robinson*, 180 Cal.App.2d 745, 751, 4 Cal.Rptr. 679, 682-83 (1960)(similar, as alleged abandonment came after the defendant had committed sufficient overt acts to constitute an attempt); *People v. Miller*, 2 Cal.2d 527, 42 P.2d 308 (1935)(defendant relinquished gun to another before shooting the person that he had threatened he would kill); *Wooldridge v. United States*, 237 F. 775 (9th Cir. 1916) (defendant left store before committing rape).

1    Indeed, nothing in the trial testimony established, or could establish on the facts involved, that – if they

2    had not first stopped and retrieved the shotgun that Rosas shot Stockmann with – Rosas could not have

3    at any time followed through with the original plan to slit Stockmann's throat.  Rosas still was sitting

4    behind Stockmann with the knife, and they still were driving down the back roads of the remote area

5    intended for the killing.  Other than Rosas' *post hoc* self-serving testimony as to his internal intent, there

6    was no external, discernible difference between one point where Stockmann was driving down the road

7    literally in mortal peril and another when, purportedly, he was not.  Rosas at all times sat behind

8    Stockmann in position to commit the murder with the planned murder weapon in his possession.  Rosas

9    never took *any* action demonstrating an alleged abandonment of his intent to murder Stockmann at any

10    point prior to the time that he instead shot him in the back with the shotgun.[33]

11        Petitioner has not established by apposite citation that he met the threshold requirement for an

12    abandonment defense in Nevada given that he took no *action* reflecting such an abandonment of intent.

13    At bottom, insofar as actions were concerned, he simply had not slit Stockmann's throat as planned

14    prior to the time that he instead shot him, but he still very much had the capacity to do so and had taken

15    no action to the contrary.  Petitioner cites no apposite authority that his *post hoc* self-serving testimony

16    only that he internally had abandoned his intent – with no action reflecting such alleged abandonment

17    – was sufficient to mount such a defense.[34]

18        Moreover, a determination that there was not a reasonable probability of a different outcome

19    at trial if such an exceedingly weak defense had been pursued further was not an objectively reasonable

20    application of *Strickland*.  As with Rosas' other defenses, such an abandonment defense at bottom

21

---

22       [33]*Cf.* 8 AmJur Proof of Facts 2d 231 § 3 (1976)(mere withdrawal or abandonment is insufficient, and the

23    defendant instead must clearly and timely communicate to his coconspirators that he has withdrawn from the criminal plan such that "[s]ome affirmative act by the defendant, reasonably calculated to communicate the fact of his withdrawal

24    to his confederates is essential," with some jurisdictions further requiring that the defendant seek to actively prevent the crime and/or inform the authorities).

25       [34]Given that petitioner relies upon inapposite non-Nevada case law from nearly a century ago, it accordingly

26    should not be a too obscure reference to cite a somewhat more apposite Nevada case from only a couple of decades further back.  In *State v. Gray*, 19 Nev. 212, 8 P. 456 (1885), the defendant similarly claimed that he had abandoned his

27    intent, that he "was endeavoring in good faith to leave the premises without committing any felony whatsoever," and that he only "accidentally" shot the victim with the shotgun.  The Supreme Court of Nevada held that the trial court properly

28    refused an instruction on abandonment of intent.

hinged upon a jury believing a defendant regarding his purely internal mental processes who had lied repeatedly to the police in multiple different versions of the event seeking to avoid culpability. Rosas ultimately admitted that he planned to kill the victim and that he lured him to a remote area to do so, but he then sought to maintain that he "lost his nerve," yet still nonetheless shot the victim that he previously had planned to kill "by accident," and then shot the victim a second time because he was "coerced" by an unarmed accomplice. The virtually nil possibility that a jury might acquit based upon such a strained and implausible account does not demonstrate the requisite prejudice under *Strickland.*

Ground 3(E) does not provide a basis for federal habeas relief.[35]

### *Mistake-of-Fact Defense – Ground 3(F)*

In Ground 3(F), petitioner alleges that he was denied effective assistance when trial counsel failed to competently cross-examine the forensic pathologist regarding cause of death and for failing to pursue a mistake-of-fact defense. Petitioner suggests that counsel should have explored an alleged discrepancy between the pathologist's trial testimony and her preliminary hearing testimony regarding the mortality of the two wounds. Petitioner further suggests that "[i]f the first shot was indeed immediately fatal, a 'mistake of fact' defense was viable."[36] That is, petitioner maintains that he allegedly would not be guilty of first-degree murder if the first, allegedly immediately fatal, shot was accidental and the second shot could not have killed Stockmann because he allegedly already was dead.

On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> 7.   Failure to adequately cross-examine forensic pathologist
> Dr. Ellen Clark
>
> Rosas also contends that the district court improperly denied his claim that Pusich was ineffective for failing to cross-examine forensic

---

[35]Petitioner further had not abandoned or terminated the kidnapping that served as a predicate felony for felony murder. That is, he had not terminated the ruse that they had used to entice Stockmann to the remote area in the first instance. Again, there is nothing to distinguish the circumstances under which the three are on a remote back road at one point in time from another, up through the point that Stockmann is killed as had been planned in Nevada, albeit through different means. Through the entire episode, Stockmann had been enticed to the remote area on false pretenses ostensibly to look for his truck; and, through virtually the entire episode, Rosas was in a position to kill Stockmann as planned, first by one instrumentality and then by another.

[36]#22, at 29.

pathologist Dr. Ellen Clark and pursue a "mistake of fact" defense theory.  Stockmann was shot by Rosas first in the back and then later in the head.  Dr. Clark testified at Rosas's preliminary hearing that both wounds were fatal, and that either one could have independently caused Stockmann's death. But she could not determine by examining the body which wound was inflicted first. If Stockman was initially shot in the back, Dr. Clark opined, there may have been an "interval of consciousness" before Rosas shot him in the head.

According to Rosas, Dr. Clark's trial testimony on this matter changed "slightly" from her preliminary hearing testimony and that the strength of her opinions carried less force. Rosas maintains that Pusich should have impeached Dr. Clark on cross-examination during trial with her preliminary hearing testimony and argued that Rosas could not be guilty of first-degree murder because Stockmann was in fact dead when he fired the second gunshot to his head.

The district court found that Rosas failed to demonstrate how he was prejudiced by any failure by Pusich on this matter. We agree.

Our review of the preliminary hearing and trial transcripts reveals that Dr. Clark's testimony on this matter was essentially the same. During both proceedings she testified that both wounds were fatal, she could not determine from the body which wound was inflicted first, and if the back wound occurred first there would have been a period of consciousness. Rosas has failed to demonstrate how Pusich could have successfully impeached Dr. Clark at trial with her preliminary hearing testimony.

Moreover, Rosas has also failed to show how a "mistake of fact" defense based upon the premise that Stockmann was already dead when Rosas fired the second shot would have had any reasonable likelihood of success at trial. For such a defense to have been successful, the jury would have had to believe that the first wound Stockmann received from Rosas was an accident. Given that Rosas entered into a plan to murder Stockmann, lured Stockman to a remote location, specifically asked to see Stockmann's loaded shotgun, disengaged the gun's safety, and proceeded to shoot Stockmann in the back, Rosas's claim that this first shot was an accident is unbelievable. That Rosas had prior military training, testified that his finger actually pulled the gun's trigger, and shot Stockmann a second time in the head to ensure that he was dead only strengthens this conclusion and further belies Rosas's story that the first shot was an accident.

Rosas failed to demonstrate that Pusich's cross-examination of Dr. Clark was deficient in any manner and that a "mistake of fact" defense had any probability of success at trial. For these reasons, we conclude that the district court properly denied Rosas relief on this claim.

#30, Ex. 79, at 10-12.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* and following authority.

-35-

1     At bottom, petitioner's claim is grounded in two fundamentally flawed premises.  The first

2  flawed premise is that there is a discrepancy of substance between the pathologist's preliminary hearing

3  and trial testimony.  There is not.  The second flawed premise is that the pathologist's testimony

4  supported a conclusion that the first shot was immediately fatal.  It did not, at either proceeding.

5     The forensic pathologist's trial testimony did not differ in any respect material to the issues in

6  this case from her preliminary hearing testimony.

7     At the preliminary hearing, Dr. Clark testified: (a) that "I can't tell you the order of wounding"

8  as between the shot to the trunk and the shot to the head; (b) that "I can't tell you the survival interval

9  with any precision, though both wounds were severe and passed through vital organs, so a short survival

10  interval would have occurred . . . after the shot;" and (c) that "both wounds were fatal" given that "either

11  one independently of the other could have caused death solely in and of themselves."  Accordingly, if

12  the shot to the trunk had been the first shot, Stockmann would not have survived that shot had there not

13  been a second shot to the head.  Dr. Clark, however, as noted, already had testified that "a short survival

14  interval would have occurred," so she did not testify – at any point during her preliminary hearing

15  testimony – that  death from the chest shot would have been instantaneous.  Dr. Clark further testified

16  – with regard to *consciousness* not *survival* – that "[i]f the first shot is the chest wound, there . . . may

17  have been an interval of consciousness" but that "[i]f the first shoot [sic] were the head wound . . .

18  unconsciousness would have been nearly instantaneous."  She testified that the head shot nearly

19  completely destroyed the right side of the brain but also damaged the vital respiratory centers at the base

20  of the brain.  She testified that "I cannot tell you whether the heart was beating when the shot was

21  delivered to the head, but I'm not certain it has to do with the amount of damage to the brain."[37]

22     At trial, Dr. Clark testified: (a) that she could not determine the order of wounding as between

23  the two shots; (b) that the trunk "wound not be instantaneously fatal" as "[t]here may be some signs of

24  life and there may well have been with the chest wound alone," and that the head wound "would not

25  have been necessarily been immediately fatal either," because the wound did not completely transect

26  the structures at the base of the brain; and (c) that either or both of the wounds would have been fatal

27

28     [37]#23, Ex. 5, at 84-85, 86 & 88.

1    "in a very short time frame."  Dr. Clark further testified – again with regard to *consciousness* not

2    *survival* – that Stockmann could have been conscious after the trunk wound but "in all likelihood" not

3    after the head shot.[38]

4           There thus was no "discrepancy" of any material substance between Dr. Clark's preliminary

5    hearing and trial testimony.

6           At both the preliminary hearing and at trial, Dr. Clark testified that she could not determine the

7    order of wounding between the two shots from forensic examination alone.

8           At both the preliminary hearing and at trial, Dr. Clark testified that there may have been an

9    interval of survival after each shot.  She did not testify as to *either* shot – at the preliminary hearing or

10   at trial – that death would have been instantaneous.

11          At both the preliminary hearing and at trial, Dr. Clark testified that Stockmann may have

12   remained conscious after the trunk shot but that loss of *consciousness* would have been instantaneous

13   after the head shot.  *Consciousness* and *survival* of course are distinct concepts, and Dr. Clark never

14   testified at either the preliminary hearing or at trial that *death* would have been instantaneous from

15   either shot.

16          At both the preliminary hearing and at trial, Dr. Clark testified that either wound would have

17   been fatal if sustained alone, but, again, she did not testify, at either proceeding, that either wound

18   would have been *instantaneously* fatal.  She testified to the contrary, at both proceedings, that there

19   would have been a short interval of survival – as distinguished from *consciousness* – after both wounds.

20          Petitioner has not identified any discrepancy of substance between the pathologist's preliminary

21   hearing and trial testimony that would have provided a basis for an outcome-altering cross-examination.

22   Petitioner points to the fact that trial counsel agreed with state post-conviction counsel during her state

23   evidentiary hearing testimony that there was a discrepancy in Dr. Clark's testimony.  Such agreement,

24   such as it was,[39] has no significance on federal habeas review.  *Cf. Harrington*, 131 S.Ct. at 790

---

[38]#25, Ex. 28, at 59-61.

[39]Trial counsel stated that "[n]ow that you've pointed it out, I see that she changes somewhat, although it is consistent with what Mr. Rosas had reported that Ms. Linton told him at the scene." #29, Ex. 70, at 155.

1    ("*Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance,

2    not counsel's subjective state of mind.").  Three reviewing courts – the state district court, the state

3    supreme court, and now this Court – have compared Dr. Clark's preliminary hearing testimony and her

4    trial testimony and have not found any discrepancy of substance.  Any such agreement between trial

5    counsel and state post-conviction counsel as to the pathologist's testimony "changing somewhat" cannot

6    override what the reviewing courts see with their own eyes in the transcripts themselves.

7         Petitioner's first premise that there is a discrepancy of substance between the pathologist's

8    preliminary hearing and trial testimony thus is wholly and completely flawed.  Whatever fine ephemeral

9    gossamer of a distinction is perceived by petitioner between Dr. Clark's preliminary hearing and trial

10   testimony -- one that has been "missed" now by three reviewing courts -- such clearly would not have

11   been a matter that would have led a jury to reach a different determination as to guilt.

12        Petitioner's second premise – that Dr. Clark's testimony supported a mistake-of-fact defense

13   – is just as flawed.

14        Petitioner posits in the federal reply that "[if] the first shot was indeed immediately fatal, a

15   "mistake of fact" defense was viable."[40]  Petitioner's argument is a complete *non sequitur*.  There is

16   nothing, absolutely nothing, in the preliminary hearing or trial testimony summarized by petitioner

17   leading up to this argument that leads to a conclusion that "the first shot was indeed immediately fatal."

18   Dr. Clark provided no such testimony as to *either* shot.  And as the Court has indicated now several

19   times, loss of *consciousness* is not loss of *life* .  This is a murder case, not a deprivation of

20   consciousness case.  Moreover, while forensic pathology alone could not determine the order of the

21   shots, the *only* testimony at trial – *including that by Rosas himself* – was that he shot Stockmann first

22   in the back.[41]  Dr. Clark testified – both at the preliminary hearing and at trial – that there would have

23   been an interval of both consciousness and, critically, *life* after that trunk shot.

24        Petitioner's mistake-of-fact theory thus is completely flawed and directly belied by the state

25   court record.  Nothing in the forensic pathology testimony supports the claim, and the testimony at trial

26   _____

27        [40]#48, at 21.

28        [41]E.g., #25, Ex. 28, at 78-79 & 91-93.

instead was that Rosas shot Stockmann the second time in the head after Linton saw him still moving.[42]

Trial counsel clearly did not render deficient performance by not pursuing such a factually unsupported theory,[43] and there clearly was not a reasonable probability that pursuit of such a flawed and unsupported theory would have changed the outcome of the trial.  The state supreme court's rejection of this claim thus was not an objectively unreasonable application of *Strickland*.

Ground 3(F) does not provide a basis for federal habeas relief.[44]

***Penalty Phase Claims: Grounds 3(G), 3(H) and Parts of Grounds 3(A) & 3(C)***

In addition to the claims identified in Grounds 3(A) and 3(C) regarding use of mental health evidence and Janet Cordova's testimony in the penalty phase, petitioner presents further claims pertaining to the penalty phase in Grounds 3(G) and 3(H).  In Ground 3(G), he alleges that he was denied effective assistance of counsel when trial counsel called Dr. Bill O'Donohue in the penalty phase rather than an allegedly competent expert.  In Ground 3(H), petitioner alleges that he was denied effective assistance when trial counsel did not call his brother, Sergio Rosas in the penalty phase.

Three months prior to trial, the State filed a notice of its intent to *not* seek the death penalty. [45] The case was tried as a noncapital murder case, including during the penalty phase.

The state supreme court rejected claims presented to that court on the following grounds:

> 5.    Failure to call brother Sergio Rosas as a witness
>
> Rosas next contends that the district court improperly denied his claim that Pusich was ineffective for failing to call his brother Sergio Rosas as a witness during the penalty phase of his trial.  Sergio testified during the evidentiary hearing about abuse he and Rosas suffered from their father as children, as well as incidents of domestic violence they observed between their parents. He also testified about Rosas's alcohol and drug use, as well as sexual abuse Rosas endured from his stepsister. Sergio's testimony, Rosas contends, would have supported his defense

---

[42]#25, Ex. 28, at 37.

[43]Cf. #29, Ex. 70, at 156 (trial counsel indicated that she did not have a witness to contradict the trial testimony that Stockmann still was moving after the first shot in the back and that "what I needed was a witness that said absolutely he was not").

[44]The Court notes again here as well, that this purported "mistake-of-fact" defense would not have undercut culpability for felony murder.

[45]#23, Ex. 10.

theory and also resulted in a more lenient sentence.

The district court found Sergio to be a credible witness, but that Pusich's decision not to call him to testify during the penalty hearing was a reasonable one. Even if Sergio had testified, the district court also found, there was no reasonable probability that Rosas would have received a more lenient sentence. We agree.

Our review of the record reveals that Rosas's mother, Kelly Jo Guzman, testified at his penalty hearing about the severe physical abuse Rosas suffered by his father and sexual abuse he suffered from his stepsister. His mother also testified about domestic violence and family instability Rosas experienced while growing up and that he had attempted suicide. Psychologist Dr. William O'Donohue also testified during that hearing about the abuse Rosas suffered as a child from his father and the mental health problems he experienced as a result of that abuse.

Although the testimony of Sergio may have been moving, it would have also been largely duplicative of testimony already presented to the jury during the penalty hearing. Rosas has failed to demonstrate that his sentence would have been different had Pusich called Sergio to testify and that any decision by Pusich not to call him as a witness was unreasonable. We conclude that the district court properly denied Rosas relief on this claim.

. . . . .

8.    Failure to call favorable psychologists or psychiatrists to testify during the guilt and penalty phases

Rosas finally contends that the district court improperly denied his claim that Pusich was ineffective for failing to call a favorable psychologist or psychiatrist to testify during the guilt phase of his trial and was equally ineffective for calling Dr. O'Donohue, a psychologist, to testify during the penalty phase. He contends that Dr. O'Donohue's testimony was damaging and that a different psychologist, such as Dr. Mahaffey, should have been called to testify on his behalf instead.

The district court found that Pusich's decisions on this matter were not unreasonable and that Rosas failed to show prejudice. We agree.

Pusich testified at the evidentiary hearing that Rosas was evaluated prior to trial by Dr. O'Donohue, whom she had previously relied upon in other cases and whose results she trusted. Like Dr. Mahaffey, Dr. O'Donohue concluded that Rosas suffered from post-traumatic stress. But unlike Dr. Mahaffey, Dr. O'Donohue concluded that Rosas was malingering during much of his evaluation.

Pusich's prior experience with Dr. O'Donohue was that he was a straightforward witness. She determined that his testimony was best suited for a case in mitigation during the penalty phase. Rosas has failed to show that Pusich's decision on this matter was unreasonable.

-40-

Moreover, Rosas's claim that Pusich was ineffective for not instead securing the testimony of Dr. Mahaffey-who evaluated Rosas many years after Dr. O'Donohue and only after Rosas had been convicted-invokes the type of speculation and hindsight that is proscribed when reviewing counsel's performance. As previously discussed, we conclude that Pusich was not ineffective for failing to call Dr. Mahaffey to testify during the guilt phase of trial. Our conclusion applies to Pusich's decision not to call her to testify during the penalty phase as well.

Rosas failed to show that had Pusich called any different, or additional, mental health professionals to testify on his behalf during either phase of his trial that the result of the proceedings would have been different. . . . .

#30, Ex. 79, at 8-9 & 12-13 (footnotes omitted).

As the Ninth Circuit has noted, "the Supreme Court has not delineated a standard which should apply to ineffective assistance of counsel claims in noncapital sentencing cases [such that] ... there is no clearly established federal law as determined by the Supreme Court in this context." *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir.2006)(quoting prior authority); *Davis v. Belleque*, 2012 WL 76897 (9th Cir., Jan. 11, 2012)(unpublished); *Vigil v. McDonald*, 2011 WL 5116915 (9th Cir., Oct. 28, 2011) (unpublished)(harmonizing authority). Because there was no clearly established Supreme Court precedent that applies in this noncapital sentencing context, petitioner cannot establish that the state courts' rejection of his claim was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Id.* Even if the Supreme Court were to announce such law subsequently, the state supreme court's decision nonetheless must be viewed in relation to the law at the time of the state supreme court's May 2, 2006, decision on the merits on state post-conviction review. *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011).

Petitioner's claims regarding the penalty phase accordingly fail to present a basis for federal habeas relief.[46]

_____

[46]Petitioner's reliance on capital sentencing cases is misplaced, for the reason outlined in the text.

The Court further concurs with the state supreme court's assessment of the claims, substantially for the reasons discussed by that court. The lack of explicit discussion of the penalty-phase claim regarding Janet Cordova's testimony in the state supreme court's order does not necessarily reflect that the claim was not rejected on the merits. An appellate court is not required to explicitly address every jot and tittle of every claim raised in order to dispose of claims on the merits. Even if this Court were to review the particular claim *de novo*, the Court would conclude that there is not a reasonable probability that calling Janet Cordova at the penalty phase would have altered the result of that proceeding.

***Consideration of Possible Issuance of a Certificate of Appealability***

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability.  *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.  While both showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." 529 U.S. at 485, 120 S.Ct. at 1604.  Where a plain procedural bar is properly invoked, an appeal is not warranted.  529 U.S. at 484, 120 S.Ct. at 1604.

The Court denies a certificate of appealability, for the reasons outlined below.

***Sufficiency of the Evidence of First-Degree Murder – Ground 6***

The Court addressed this claim first because, *inter alia*, consideration of the prejudice issue on petitioner's claims of ineffective assistance of counsel involved consideration of the overall evidence.

In Ground 6, petitioner alleges that he was denied due process because the evidence at trial allegedly was insufficient to prove beyond a reasonable doubt that petitioner committed the premeditated, willful and deliberate murder of the victim as required for a conviction of first-degree murder as opposed to second-degree murder or voluntary manslaughter.

Petitioner in essence proceeds on the premise that if a defendant simply testifies that he only accidentally shot the victim the first time after he intentionally disengaged the weapon's safety and that he then shot the possibly still-moving victim a second time in the back of the head because someone

else "insisted" that he do so, the jury must accept this testimony at face value and cannot convict him of first-degree murder.  Such clearly is not the law.  The jury readily could infer from evidence presented at trial that petitioner intentionally lured the victim to a remote area pursuant to a premeditated plan to kill him, that petitioner – at least as of the time that he instead shot the victim – had not yet followed through on the initial plan of instead stabbing him to death by hand with a knife, that petitioner then seized upon the opportunity presented of simply shooting the victim in the back, that the firearm-experienced petitioner disengaged the safety on the weapon for this very purpose and then shot the victim, that petitioner then – whether at another's "insistence" or not – shot the victim a second time in the head to make sure that he died, that petitioner thereafter bragged about his intentional killing of the victim, and that petitioner thereafter tried to conceal his "accidental" shooting of the victim through a series of lies culminating in the "accidental shooting" account.  Clearly, against the backdrop of the evidence presented, the jury was not required to accept petitioner's self-serving account; and the jury could infer from the remaining evidence, from both prior to and after the first shot, that the shooting was intentional and premeditated rather than accidental.  **See text, *supra*, at 3-7.**

Moreover, even if petitioner could establish, on the only exhausted and non-defaulted claim before the Court in this regard, that his self-serving claim that the first shot was accidental rendered the evidence insufficient to demonstrate that the killing was willful, premeditated, and deliberate, which he cannot, he still would not be able to establish thereby that the evidence was insufficient to sustain his conviction for first-degree murder.  Petitioner also was prosecuted for felony murder.  **See text, *supra*, at 8 & n.2.**

Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

### *Mental Health Defense – Ground 3(A), vis-à-vis Guilt Determination*

In Ground 3(A), petitioner alleges as to the guilt determination that he was denied effective assistance of counsel when trial counsel failed to call a competent mental health expert, failed to present a mental health defense to the specific intent elements of the offenses, and failed to proffer a theory of defense instruction concerning same.  (Parallel penalty phase claims are discussed, *infra*.)

-43-

1    The psychologist that petitioner presented in support of the claims on state post-conviction

2  review: (a) opined that petitioner "could distinguish right from wrong," had the capacity to make

3  voluntary choices, and "had capacity for deliberation;" (b) "did not conclude that he lacked capacity for

4  premeditation;" and (c) could not rule out the conclusion that Rosas  formed the specific intent to kill.

5  While petitioner points to a variety of sundry conditions and circumstances testified to by the

6  psychologist, given the key findings – and absence of findings – by the psychologist, the state supreme

7  court's conclusion that petitioner failed to carry his burden of demonstrating that there was a reasonable

8  probability that, but for trial counsel's failure to pursue a "mental health defense," the outcome of the

9  trial would have been different was not an unreasonable application of *Strickland* .  This same basic

10  conclusion holds true as well with regard to petitioner's claim that trial counsel should have requested

11  a "state of mind" theory of defense instruction.  **See text,** *supra,* **at 9-13.**

12    Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the

13  state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of

14  clearly established federal law.

15    ***Firearms Expert Testimony as to Trigger Pull – Ground 3(B)***

16    In Ground 3(B), petitioner alleges that he was denied effective assistance of counsel when trial

17  counsel failed to call a firearms expert to corroborate his defense that the first shot was accidental with

18  expert testimony regarding the trigger pull of the shotgun.

19    Petitioner's selective focus on the shotgun's "light trigger pull" glosses over clear and

20  unequivocal and testimony by the expert at the state post-conviction hearing that, consistently and

21  repeatedly, debunked any notion that the shotgun's trigger pull, in and of itself, supported an accidental

22  shooting claim.  Nothing in the expert's testimony regarding the shotgun itself supported a theory that

23  the first shot was accidental.  His testimony regarding the shotgun instead belied such a claim.  Further,

24  the firearms expert clearly did not testify – and clearly could not testify competently – that the otherwise

25  entirely safe trigger pull on the weapon combined with a mental health condition could have caused an

26  accidental firing of the weapon.  The psychological expert testimony presented at the state court

27  evidentiary hearing similarly did not provide competent evidence supporting a claim that"a full-blown

28  PTSD episode" "amplified the gun's already light trigger."  Neither the firearms expert testimony nor

-44-

1  the psychological expert testimony presented at the state court evidentiary hearing, whether singly or

2  in combination, supported the bare assertion made by petitioner.  **See text, *supra*, at 13-17.**[47]

3       Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the

4  state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of

5  clearly established federal law.

6       ***Testimony by Janet Cordova – Ground 3(C), vis-à-vis Guilt Determination***

7       In Ground 3(C), petitioner alleges as to the guilt determination that he was denied effective

8  assistance of counsel when trial counsel failed to call his former fiancée or girlfriend, Janet Cordova.

9  Petitioner contends, as to the guilt phase, that trial counsel was ineffective because Cordova would have

10  presented evidence to support Rosas' mental state, intoxication, and coercion defenses.

11       The evidentiary hearing testimony upon which petitioner relies includes testimony by Cordova

12  that quite possibly would not have been even admissible at trial.  Rosas' statements to Cordova

13  subsequent to the incident likely would not have been admissible as prior consistent statements because

14  Rosas already had a motivation to fabricate when he, allegedly, made the statements to Cordova.  **See**

15  **text, *supra*, at 19.**

16       To the extent that Cordova could have presented admissible guilt phase testimony for the

17  defense, the state supreme court's holding that petitioner failed to demonstrate deficient performance

18  was neither contrary to nor an unreasonable application of *Strickland* and following authority.

19  Weighing the relative pros and cons of putting a particular witness on the stand is a classic tactical

20  decision.  **See text, *supra*, at 18-21.**

21       Further, for the reasons outlined below, the state supreme court's holding that petitioner failed

22  to demonstrate resulting prejudice was neither contrary to nor an unreasonable application of clearly

23  established federal law.  The state supreme court's determination that there was not a reasonable

24  probability that calling Cordova to bolster petitioner's mental health, intoxication, and coercion

25  defenses would have altered the outcome at trial was not objectively unreasonable.

26  _____

27       [47]Moreover, for felony murder, the State was required to prove that Rosas had the specific intent only to
28  commit kidnapping, an offense already well underway, prior to the first, allegedly "accidental," shot.  See text, *supra*, at 8 & n. 2.

1    With respect to the purported mental health defense, as discussed *supra* regarding Ground 3(A),

2    petitioner's psychologist, Dr. Mahaffey, testified, after having, *inter alia*, viewed or reviewed Cordova's

3    state evidentiary hearing testimony, that: (a) petitioner "could distinguish right from wrong," had the

4    capacity to make voluntary choices, and "had capacity for deliberation;" (b) she"did not conclude that

5    he lacked capacity for premeditation;" and (c) she could not rule out the conclusion that Rosas formed

6    the specific intent to kill.   The state supreme court's determination that there was not a reasonable

7    probability that Cordova's testimony would have altered the outcome at trial when presented to support

8    a mental health defense culminating with such expert testimony clearly was not an objectively

9    unreasonable application of *Strickland*.   **See text, *supra*, at 21; see also text, *supra*, at 9-13.**

10   With respect to a purported intoxication defense, as discussed regarding Ground 3(D), the state

11   supreme court's determination that petitioner failed to demonstrate that such a defense had a reasonable

12   probability of altering the outcome at trial was not an objectively unreasonable application of

13   *Strickland*.   Cordova's testimony was, at best, inconclusive regarding the amount that Rosas' drank on

14   the critical night in question.   The state supreme court's determination that there was not a reasonable

15   probability that Cordova's testimony would have altered the outcome at trial when presented to support

16   an intoxication defense -- particularly given the applicable Nevada law and the expert testimony

17   presented at the state evidentiary hearing referenced as to Ground 3(D)-- was not an objectively

18   unreasonable application of *Strickland*.   **See text, *supra*, at 22; see also text, *supra*, at 25-30.**

19   With regard to a purported coercion defense, petitioner's late-breaking – in terms of articulation

20   to a court – coercion theory based upon Cordova's hearsay testimony is problematic for a number of

21   reasons.   *First*, the late-breaking coercion theory based upon Cordova's hearsay testimony conflicts with

22   petitioner's own trial testimony, both as to what Linton said and as to, indeed, whether he feared Linton

23   at all.   **See text, *supra*, at 22-24.**   *Second*, the alleged "coercion" involved provides absolutely no valid

24   justification under Nevada law for shooting the possibly still-living victim in the head, particularly with

25   petitioner being the only person at the scene who was armed.   **See text, *supra*, at 24.**

26   Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the

27   state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of

28   clearly established federal law.

***Intoxication Defense – Ground 3(D)***

In Ground 3(D), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to call a substance abuse and alcohol blackout expert during the guilt determination in support of a voluntary intoxication defense to the specific intent offenses and failed to proffer a corresponding "theory of defense" jury instruction.

At the outset, this Court is not sanguine that, in a federal criminal trial under similar circumstances, the Court would have admitted the purported expert testimony tendered at the state evidentiary hearing at trial over an objection under Rule 702 of the Federal Rules of Evidence.  Even allowing for the constitutional right to present a defense, this Court would have little difficulty concluding in a federal criminal trial on similar facts that the testimony was not based upon sufficient facts or data, that the testimony was not the product of reliable principles or methods, and that, to the extent that any principles or methods *arguendo* were involved, the witness had not applied any such principles and methods reliably to the facts of the case.  The state supreme court's conclusion that there was not a reasonable probability that such testimony would have altered the outcome at trial clearly was neither contrary to nor an unreasonable application of *Strickland*.  **See text, *supra*, at 25-29.**  Moreover, petitioner never has made the threshold factual showing, including at the state evidentiary hearing, that would have been required for obtaining an intoxication defense instruction under Nevada state law.  **See text, *supra*, at 28 & 29-30.**

Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

***Abandonment Defense – Ground 3(E)***

In Ground 3(E), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to question him competently regarding his alleged abandonment of the intent to commit murder and to offer a jury instruction in support of the defense.

Petitioner cites no apposite Nevada case authority establishing that a defendant even can get a jury instruction, much less present a viable defense, simply by declaring after the fact that "in his heart of hearts" he had lost his nerve, despite having already lured the victim to the remote area intended for

the killing, despite in truth still being in position to kill the victim with the originally intended weapon still being in his possession, despite not telling his confederate that he allegedly had abandoned his intent, and despite never warning the intended victim, which thereby would have actually ended any chance that petitioner might in an instant "rediscover" his nerve and slit the victim's throat during the still-continuing opportunity to do so.  Other than petitioner's *post hoc* self-serving testimony as to his internal intent, there was no external, discernible difference between one point where the victim was driving down the road literally in mortal peril and another when, purportedly, he was not.  Petitioner at all times sat behind the victim in position to commit the murder with the planned murder weapon in his possession. He never took *any* action demonstrating an alleged abandonment of his intent to murder the victim at any point prior to the time that he instead shot him in the back with the shotgun.

    As with petitioner's other defenses, such an abandonment defense at bottom hinged upon a jury believing a defendant regarding his purely internal mental processes who had lied repeatedly to the police in multiple different versions of the event seeking to avoid  culpability.  Petitioner ultimately admitted that he planned to kill the victim and that he lured him to a remote area to do so, but he then sought to maintain that he "lost his nerve," yet still nonetheless shot the victim that he previously had planned to kill "by accident," and then shot the victim a second time because he was "coerced" by an unarmed accomplice.  The virtually nil possibility that a jury might acquit based upon such a strained and implausible account does not demonstrate the requisite prejudice under *Strickland*.

    Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  **See text,** ***supra*, at 30-34.**

### *Mistake-of-Fact Defense – Ground 3(F)*

    In Ground 3(F), petitioner alleges that he was denied effective assistance when trial counsel failed to competently cross-examine the forensic pathologist regarding cause of death and for failing to pursue a mistake-of-fact defense.  Petitioner suggests that counsel should have explored an alleged discrepancy between the pathologist's trial testimony and her preliminary hearing testimony regarding the mortality of the two wounds.  Petitioner further suggests that "[i]f the first shot was indeed immediately fatal, a 'mistake of fact' defense was viable."  That is, petitioner maintains that he allegedly

1 would not be guilty of first-degree murder if the first, purportedly immediately fatal, shot was accidental

2 and the second shot could not have killed the victim because he allegedly already was dead.

3     At bottom, petitioner's claim is grounded in two fundamentally flawed premises.  The first

4 flawed premise is that there is a discrepancy of substance between the pathologist's preliminary hearing

5 and trial testimony.  There is not.  **See text, *supra*, at 34-38.**  The second flawed premise is that the

6 pathologist's testimony supported a conclusion that the first shot was immediately fatal.  It did not, at

7 either proceeding.  **See text, *supra*, at 38-39.**

8     Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the

9 state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of

10 clearly established federal law.[48]

11     ***Penalty Phase Claims: Grounds 3(G), 3(H) and Parts of Grounds 3(A) & 3(C)***

12     In addition to the parallel claims regarding the penalty phase in Grounds 3(A) and 3(C)

13 regarding use of mental health evidence and Janet Cordova's testimony in the penalty phase, petitioner

14 presents further claims pertaining to the penalty phase in Grounds 3(G) and 3(H).  In Ground 3(G), he

15 alleges that he was denied effective assistance of counsel when trial counsel called Dr. Bill O'Donohue

16 in the penalty phase rather than an allegedly competent expert.  In Ground 3(H), petitioner alleges that

17 he was denied effective assistance when trial counsel did not call his brother in the penalty phase.

18     Under controlling Ninth Circuit law, there is no clearly established law as determined by the

19 Supreme Court in the context of noncapital sentencing.  Because there was no clearly established

20 Supreme Court precedent that applies in this context, petitioner cannot establish that the state courts'

21 rejection of his claims was either contrary to or an unreasonable application of clearly established

22 federal law as determined by the United States Supreme Court.  **See text, *supra*, at 39-41.**

23     ***Prior Procedural Dismissal***

24     In the federal reply, petitioner additionally requests a COA as to the dismissal of Grounds 2, 4,

25 5 and 7 as procedurally barred.  For the reasons assigned in its prior order (#45), jurists of reason would

26

27     [48]The Court notes again here as well that this purported "mistake-of-fact" defense would not have undercut

28 petitioner's culpability for felony murder.

1    not find it debatable whether the district court was correct in its procedural ruling.  Petitioner's

2    arguments were, at their best, without merit under then-governing precedent, and, at their worst,

3    frivolous.  See #45, at 8, lines 5-11.

4           The Court notes that in its recent decision in *Martinez v. Ryan*, ___ S.Ct. ___, 2012 WL 912950

5    (Mar. 20, 2012), the Supreme Court held that, in certain circumstances, the failure of state post-

6    conviction counsel to raise claims of ineffective assistance of trial counsel in what the Court described

7    as "initial-review collateral proceedings" may constitute cause to excuse a procedural default of *such*

8    *claims*.  This Court notes the following with regard to the application of the *Martinez* holding to the

9    prior procedural default rulings in this case.

10          First, procedurally defaulted Grounds 2, 4 and 7 are not claims of ineffective assistance of trial

11   counsel.  They are independent substantive claims.  *Martinez* does not hold that a habeas petitioner may

12   rely upon alleged ineffective assistance of state post-conviction counsel as cause to excuse the

13   procedural default of substantive claims that could have been raised in the original criminal

14   proceedings.

15          Second, Ground 5 is a claim of ineffective assistance of appellate counsel.  The *Martinez* Court

16   directed what it described as its "limited" holding to claims of ineffective assistance of *trial* counsel.

17   Otherwise, "[t]he ruling of *Coleman* governs in all but the limited circumstances recognized here." Slip

18   op., at 13.  *See also id.*, at 14 ("the limited nature of the qualification to *Coleman* adopted here reflects

19   the importance of the right to the effective assistance of trial counsel . . . .).  Under the otherwise

20   applicable holing in *Coleman*, alleged ineffective assistance of state post-conviction counsel does not

21   constitute cause for failure to raise a claim.

22          Third, in all events, as to all defaulted claims, *Martinez* reaffirms that a petitioner must

23   demonstrate *both* cause *and* prejudice to overcome a procedural default.  *E.g,* slip op., at 6.  In the

24   present case, this Court already has held that petitioner failed to carry his burden of establishing

25   prejudice in opposing dismissal.  As the Court stated in its prior order:

26                  Petitioner further has failed to make a sufficient showing of
                    prejudice.  Petitioner merely refers to the allegations of the amended
27                  petition and makes conclusory assertions that his claims were
                    meritorious and that he therefore was prejudiced. #35, at 20, lines 6-8;
28                  23, lines 26-28; and 24, lines 5-8.  Petitioner has the burden of

1
2
3
4
5

> demonstrating *both* cause *and* prejudice when seeking to overcome a procedural default. *E.g., Murray*, 477 U.S. at 494, 106 S.Ct. at 2649. In order to demonstrate the requisite prejudice, the petitioner must establish not merely that the errors constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. *Leavitt v. Arave*, 383 F.3d 809, 838 (9th Cir. 2004); *Correll v. Stewart*, 137 F.3d 1404, 1415 (9th Cir. 1998). Merely conclusorily incorporating the allegations of the petition by reference fails to carry this burden.

6 #45, at 9-10 (emphasis in original).

7   The Court fully stands by its prior holding.  If anything, review of the exhausted and non-

8 defaulted claims discussed herein *supra* emphatically confirms that merely alleging claims in a petition

9 does not establish prejudice.  In seeking to avoid a dismissal on the basis of procedural default, the

10 petitioner must do more than merely refer back to the allegations of his pleadings and instead must

11 actively shoulder the burden of demonstrating "not merely that the errors constituted a possibility of

12 prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with

13 error of constitutional dimensions."  Petitioner did not do so in this case, as to any of the defaulted

14 grounds.

15   A certificate of appealability therefore will be denied as to all claims.

16                         ***Evidentiary Hearing Request***

17   Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted

18 to the record presented to the state court that adjudicated the merits of the claims.  *See Cullen v.*

19 *Pinolster,* 131 S.Ct. at 1398-1401.  The Court additionally notes in this regard that the state district

20 court held an extensive evidentiary hearing on state post-conviction review at which petitioner was

21 represented by counsel.

22   IT THEREFORE IS ORDERED that the petition shall be DENIED on the merits and that this

23 action shall be DISMISSED with prejudice.

24   IT FURTHER IS ORDERED that a certificate of appealability is DENIED.  Reasonable jurists

25 would not find debatable or wrong this Court's rejection of petitioner's claims either on the merits or

26 on the basis of procedural default.  **See text, *supra*, at 42-51.**

27   / / / /

28   / / / /

-51-

1    The Clerk of Court shall enter final judgment accordingly in favor of respondents and against

2    petitioner, dismissing this action with prejudice.

3    DATED this 24th day of March, 2012.

4

5

6    _____

7    LARRY R. HICKS
     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28